NATIONAL CONSTRUCTORS ASSOCIATION and Commonwealth Electric Company, by and on behalf of itself and all others similarly situated and the Howard P. Foley Company, by and on behalf of itself and all others similarly situated and Donovan Construction Company of Minnesota, Inc., Arthur McKee & Company, Inc., Badger America, Inc., Catalytic, Inc., C. F. Braun Constructors, Inc., Dravo Corporation, Guy F. Atkinson Company, the H. K. Ferguson Company, Jacobs Constructors, Inc., Pullman Kellogg, Division of Pullman, Inc., Stearns–Roger, Inc.,

v.

NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., Robert L. Higgins, the International Brotherhood of Electrical Workers, AFL–CIO, Charles H. Pillard, Colgan Electric, Inc., Miller Electric Co., and H. E. Autrey, Allen L. Bader, Frank H. Bertke, Donald C. Cates, Robert W. Colgan, Joe R. Devish, and Carl T. Hinote, in their Individual capacities and as Trustees of the National Electrical Industry Fund, and Allan H. Stroupe, L. R. McCord, Aldo P. Lero and Lowell C. Timm, in their official capacities as Trustees of the National Electrical Industry Fund, and John Ostrow, C. W. Stroupe, Warren Losh and J. D. Hilburn, Sr., in their Individual capacities.

Civ. No. HM77–1302.

United States District Court,
D. Maryland.

Sept. 9, 1980.

Wilbur D. Preston, Jr., Robert M. Wright, Nevett Steele, Jr., Ward B. Coe, III, Gerson B. Mehlman, and James R. Chason, of Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md; Anthony J. Obadal, Steven R. Semler, Howard J. Kaufman, Alan D. Cirker, Stephen C. Yohay, of Zimmerman & Obadal, Washington, D. C.; Ira Genberg, Peter R. Spanos, of Stokes & Shapiro, Atlanta, Ga., for plaintiffs.

Guy Farmer, of Farmer, Shibley, McGuinn & Flood, Washington, D. C., Alan I. Baron, Peter H. Gunst, of Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant National Electrical Contractors Ass'n, Inc. and all other defendants Except defendants International Broth. of Electrical Workers, AFL–CIO and Charles H. Pillard.

Thomas X. Dunn, Richard M. Resnick, of Sherman, Dunn, Cohen & Liefer, Washington, D. C., James P. Garland, Anthony W. Kraus, Steven D. Frenkil, Nora Winay, of Semmes, Bowen & Semmes, Baltimore, Md., for defendants International Broth. of Electrical Workers and Charles H. Pillard, International President of IBEW.

## MEMORANDUM OPINION

HERBERT F. MURRAY, District Judge:

### I. *Factual Background*

This is a private antitrust action for treble damages and declaratory and injunctive

relief, brought under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Currently pending before the court are eight motions, on which the court has heard extensive oral argument. An explanation of the factual background of the dispute is essential to an understanding of the pending motions.

Plaintiff National Constructors Association (NCA) is an unincorporated trade association whose members are "corporations who perform electrical construction work and who otherwise transact business in the electrical construction industry." Amended Complaint at 4. Of the remaining plaintiffs, Commonwealth, Foley, Donovan, Catalytic, Braun, Atkinson, Ferguson and Pullman–Kellogg are corporations which perform electrical construction work and employ electrical construction workers who are members of the defendant IBEW and its local unions. McKee, Badger, Dravo, Jacobs and Stearns–Roger are also corporations which perform electrical construction work, but rather than employ IBEW workers directly, they hire electrical construction contractors who in turn employ IBEW labor. None of those corporate plaintiffs except Donovan is a member of defendant National Electrical Contractors Association, Inc. (NECA).

Defendant NECA is an incorporated trade association whose members, like those of NCA, perform electrical construction work. Although NECA's principal place of business is in Bethesda, Maryland, the association has approximately 133 [1] local chapters nationwide. NECA and its local chapters provide various services to member companies, including representing members in collective bargaining with the IBEW and its local unions. Amended Complaint ¶ 4(a)(iii).

Defendant IBEW is an unincorporated labor organization whose local unions throughout the United States represent at least some of the electrical workers whom the corporate plaintiffs employ. Defendant Charles H. Pillard is now and at all perti-

nent times was International President of the IBEW; defendant Robert L. Higgins is and at all pertinent times was Executive Vice President of NECA.

Defendants Colgan Electric Co. and Miller Electric Co. are corporations engaged in the electrical contracting business and are members of defendant NECA. The remaining defendants are the trustees of the National Electrical Industry Fund (NEIF), which is more fully described below.

At the heart of the plaintiffs' suit is the collective bargaining structure in the electrical construction industry. Local chapters of NECA, which is the largest trade association in the industry, are assigned regional territories throughout the country which coincide with the jurisdictions of one or more IBEW local unions. Acting as a multi–employer bargaining unit representing its chapter members, each NECA chapter periodically negotiates a collective bargaining agreement with the IBEW union or unions in its territory. Each "Local Agreement" provides for wages, hours, terms and conditions of employment, and any other subjects of bargaining permitted by the National Labor Relations Act. A Local Agreement is either "inside," covering labor on the interior of buildings, or "outside," covering labor on outdoor power lines. Although the IBEW locals also negotiate with other local contractors' associations, the majority of the Local Agreements are the result of collective bargaining between the unions and NECA chapters.

Individual electrical contractors who are not members of NECA usually enter into a labor agreement with the IBEW in one of three ways. The most prevalent practice is for the contractor to sign a short–form agreement known as a Letter of Assent, which binds the signatory to the terms of the existing NECA–IBEW Local Agreement for the area in which the contractor works. There are two types of Letters of Assent: Type "A" authorizes the local NECA chapter to act as the signatory's

---

**1.** Some of the pleadings set the figure at 330. Suffice it to say that the local chapters are numerous.

collective bargaining agent for all matters contained in the existing NECA–IBEW Local Agreement, and remains in effect until the contractor gives timely notice of termination. Type "B" does. not authorize NECA to act as the contractor's collective bargaining agent, but merely binds the signatory for a stated period (usually the life of the current Local Agreement) to all the terms of the existing Local Agreement and any amendments that might be made to it.

The second method by which an unassociated contractor enters into a labor agreement with the IBEW is by signing an "International Agreement." Large general contractors which perform construction work at several sites across the country usually adopt this second method. The International Agreement is in effect a nationwide Letter of Assent, which binds the signatory to the terms and conditions of the NECA–IBEW Local Agreements for any and all geographic areas in which the general contractor seeks to procure IBEW labor. Made available by the IBEW's international office, an International Agreement is terminable at will upon sixty days' notice.

The third means of negotiating with the IBEW is by signing a "Project Agreement." As the name implies, such an agreement is usually designed to cover a single construction project which the contractor has in the area, and may contain any terms on which the parties agree. Although a Project Agreement is negotiated independently of the NECA agreements, the IBEW usually seeks to procure the terms of the Local Agreements in an unassociated contractor's Project Agreement.

Both NECA and the IBEW International reserve the power to approve all collective bargaining agreements entered into by local chapters or local unions. Either national body may veto an agreement if its terms do not conform to the association's or the union's policies.

As of December 1976, the vast majority of contractors in the electrical construction industry procured IBEW labor under the terms and conditions of NECA–IBEW Local Agreements, either as members of local NECA chapters, or as signatories to Letters of Assent or International Agreements.

In the summer and fall of 1975, national officials of NECA and the IBEW began negotiation of the agreement which the plaintiffs contend violates § 1 of the Sherman Act. The parties undertook the negotiations at least in part to provide for increased employer contributions to the National Electrical Benefit Fund (NEBF), which is a pension fund for IBEW workers, jointly administered by NECA and the IBEW and funded by payments provided for in electrical construction industry collective bargaining agreements. At the meetings that began in 1975, International President Charles H. Pillard and his Administrative Assistant Marcus Loftis represented the IBEW; Executive Vice President Robert L. Higgins and Director of Labor Relations Mark Hughes represented NECA.

In the spring of 1976, the parties tentatively agreed to what will hereinafter be referred to as the National Agreement, a copy of which is appended hereto as Exhibit A. The first five articles of the agreement contained provisions for the NEBF, shift work, management rights and apprentice ratios. Article Six, which is the crux of this litigation, provided as follows:

### ARTICLE SIX–INDUSTRY FUND

The parties agree to the establishment of a legally constituted trust to be called the National Electrical Industry Fund.

All construction agreements in the electrical industry shall contain the following language:

"Each individual employer shall contribute one percent (1%)* of the gross

* (an amount not to exceed 1% nor less than 0.2 of 1%, as determined by each local chapter and approved by the trustees)

labor payroll to be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will

be considered a breach of this agreement on the part of the individual employer."

The National Electrical Contractors Association will be responsible to see that the objects of the fund, as outlined in the trust, are adhered to strictly.

No part of the funds collected under this trust shall be used for purely social activities. No part of the funds collected under this trust shall be used for any purpose which is held to be in conflict with the interests of the International Brotherhood of Electrical Workers and its local unions.

Both parties will be provided with a copy of the Trust and any future amendments.

The industry fund thus created was to be used primarily to cover NECA's "costs of administration of labor agreements, industry advancement and services rendered to the electrical contracting industry." *See* Exhibit 10 to plaintiffs' motion for summary judgment.

As required by the association's bylaws, the NECA Board of Governors ratified the National Agreement at a meeting in Dallas in October 1976. The IBEW rules did not require a similar ratification vote. On December 8, 1976, both Charles Pillard and Robert Higgins signed the agreement, which was to become effective on July 1, 1977.

Between December 1976 and July 1977, NECA and the IBEW took steps to implement the National Agreement, including the new NEIF. Local IBEW unions and NECA chapters were instructed to insert the industry fund provision in existing NECA–IBEW Local Agreements. Although the defendants contend that the language of Article 6 was to be inserted only in contracts between the IBEW and NECA members, the plaintiffs argue that the defendants sought to have the language included in all construction agreements in the electrical industry.

**2.** The NEIF trustees have filed a number of related actions throughout the country, seeking to recover on a breach of contract theory the amounts which several electrical contractors

The plaintiffs allege that prior to July 1, 1977, NECA members paid dues to their association in order to pay for the services NECA offered such as advertising, negotiating, training employees and disseminating information. Because those dues added to NECA members' cost of doing business, non–NECA members allegedly had a competitive edge in bidding on electrical construction projects. The plaintiffs claim that by providing for a uniform 1% contribution to a fund that would support NECA services, and by ensuring that the 1% requirement was in *all* construction contracts in the industry, regardless of a contractor's affiliation with NECA, the defendants agreed to fix, maintain and stabilize the price of contracts with the IBEW–and consequently all prices in the electrical construction industry–for the purpose of eliminating non–NECA members' competitive advantage. The plaintiffs contend that under the line of cases beginning with *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), the National Agreement constitutes a price–fixing agreement which is on its face a *per se* violation of § 1 of the Sherman Act. They seek a declaratory judgment that the NEIF is illegal, an injunction preventing the defendants from enforcing the NEIF provisions, and monetary relief of three times the amount each plaintiff has already paid into the fund.

NECA and the trustees of the NEIF have filed counterclaims alleging that the plaintiffs have engaged and are engaging in an illegal conspiracy and boycott in violation of § 1 of the Sherman Act. The activity alleged to be illegal is the plaintiffs' concerted undertaking to refuse to pay into the NEIF, with the alleged purpose of injuring NECA and compelling it to acquiesce in the plaintiffs' plans for "a single multitrade bargaining agreement [in] all unionized sectors of the industrial construction industry." Memorandum in Support of Motion of NECA and the Trustees of the NEIF for Summary Judgment, at 1.[2]

have refused to pay into the NEIF: For purposes of this opinion, the related actions will be referred to as the "collection cases."

**518**

Of the eight motions now before the court, three are motions to dismiss. The first is the defendants' motion to dismiss NCA as a plaintiff on the grounds it lacks standing. The second is the defendants' motion to dismiss those plaintiffs who do not hire IBEW labor directly, but instead employ electrical contractors who in turn hire IBEW workers. Those parties will be referred to hereinafter as the "indirect–hire plaintiffs." The third motion is that of defendants Miller and Colgan to dismiss the complaint as to them, on the grounds that they as corporations were not involved in any alleged conspiracy.

The fourth and fifth motions to be decided are cross–motions for summary judgment on the plaintiffs' claim that the National Agreement is on its face a price–fixing agreement illegal *per se*. The sixth motion is the plaintiffs' motion for class certification, and the remaining two are cross–motions for summary judgment on the boycott counterclaims. The court will discuss the motions in the order in which they have been described.

## II. *The Motion to Dismiss Plaintiff NCA*

■ The primary issue is whether NCA has standing to sue for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. The defendants argue that a private plaintiff does not have standing at all under the antitrust laws, unless it can show some injury or threatened injury *personal to itself*; and that NCA has made no such showing. NCA claims that strict standard applies only under § 4 of the Clayton Act (15 U.S.C. § 15), where a plaintiff seeks monetary damages; and that § 16 embodies more flexible general rules of standing, including the tests set out in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), for determining when an association may sue in a purely representational capacity on behalf of its members.

If NCA could meet the stricter standard of showing direct injury to itself, there would be no need to explore the relative leniency of § 16 requirements. However, the court is not persuaded that the association is threatened with any personal harm. NCA alleges that the NEIF scheme compels NCA members to support a rival trade association, NECA, and "necessarily places a financial stricture on the operation of their own association, therefore tending to have a stifling effect upon the achieving of their association's purposes either now or in the future." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss NCA, at 2. NCA further contends that the NEIF scheme frustrates NCA's associational goal of reducing operating costs. In the court's view, the awkwardness and abstractness of the plaintiffs' description of the supposed injury reveals that NCA's contentions are without merit. Consequently, the court must determine whether the standing requirements of § 16 are nonetheless broad enough to encompass NCA.

There is long–standing authority in support of the defendants' proposition that *personal* injury is a prerequisite to instituting any private antitrust action. In *United States v. Borden*, 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954), the Supreme Court said,

Under § 16 of the Act, ... a private plaintiff may obtain injunctive relief against [antitrust] violations only on a showing of "threatened loss or damage"; and this must be of a sort personal to the plaintiff. ... [T]he private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served.

However, since *Borden* was decided, two important trends have developed: first, the courts have increasingly acknowledged that standing requirements under § 16 are broader and more flexible than those under § 4; and second, the courts have recognized

that under certain circumstances, an association may have standing solely as the representative of its members.

Section 4 of the Clayton Act provides as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Section 16, however, states in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.

In *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Supreme Court analyzed the "business or property" requirement in § 16. The Court speculated that the language difference was probably attributable to the different impacts of the remedies offered by the two sections: while 100 simultaneous injunctions could be no more effective than one, 100 treble–damage awards could be far more devastating to a defendant than a single monetary judgment. 405 U.S. at 261–62, 92 S.Ct. at 890–891. Without commenting further on the § 16 standards, the Court concluded that a party could not sue

*under § 4* without showing injury to its commercial interests. *Id.* at 264, 92 S.Ct. at 892.

Most lower federal court cases interpreting *Hawaii v. Standard Oil* have concluded that the standing requirements under § 16 are more lenient and more flexible than those under § 4. *In Re Multidistrict Vehicle Air Pollution MDL # 31*, 481 F.2d 122 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Tugboat, Inc. v. Mobil Towing Co.*, 534 F.2d 1172 (5th Cir. 1976); *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979). *Contra, NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405 (S.D. N.Y.1977), *relying on Nassau County Ass'n of Ins. Agents, Inc. v. Aetna Life & Cas. Co.*, 497 F.2d 1151 (2d Cir.), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 49 L.Ed.2d 184 (1974). The cases recognizing a distinction between § 4 and § 16 requirements imply that a party may sue for injunctive relief under the antitrust laws whenever the party can show the threat of an injury cognizable in equity and proximately caused by the defendant's antitrust violation. *Mid–West v. Continental, supra; Tugboat v. Mobil Towing, supra. See also Buckley Towers Condominium, Inc. v. Buchwald*, 595 F.2d 253 (5th Cir. 1979).

At about the same time that the courts began to hold the requirements of § 16 were more lenient, the Supreme Court was developing the doctrine that in certain well–defined circumstances, an association may have standing to represent its members even when the association as such had suffered no injury. In *Warth v. Seldin, supra*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the court considered whether various individuals and associations had standing to challenge an allegedly exclusionary zoning ordinance. Writing for the Court, Justice Powell first set out the general standing requirements in any litigation: each plaintiff must show first that there is a justiciable case or controversy, and second that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant *his* invocation of feder-

al–court jurisdiction and to justify exercise of the court's remedial powers on his behalf." 422 U.S. at 498–99, 95 S.Ct. at 2205, citing *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In elaborating on those prerequisites with respect to associations, the Court said,

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction [citations omitted]. 422 U.S. at 511, 95 S.Ct. at 2211.

In *Hunt v. Washington Apple Advertising Commission, supra,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court reiterated the language just quoted from *Warth*, and rephrased it into a three–part test:

> Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. 432 U.S. at 343, 97 S.Ct. at 2441.

In establishing that test, the Court expressly rejected the defendant's claim that the Advertising Commission could not sue because it had no "personal stake" in the outcome of the case, and had alleged no "distinct and palpable injury" to itself. At 341–42, 97 S.Ct. at 2440–2441.

In light of the developments in *Warth, Hunt* and the *Hawaii v. Standard Oil* line of cases, this court is persuaded that a plaintiff need not meet the strict personal injury standards of § 4 in order to sue for injunctive relief under § 16, and that an association may have standing under § 16 if it meets the three–part test of *Hunt*. *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684 (8th Cir. 1979); *National Office Machine Dealers Ass'n v. Monroe*, 484 F.Supp. 1306 (N.D.Ill.1980). The court has discovered no persuasive authority that would indicate associational standing is precluded in the antitrust context, and can think of no compelling reason why that should be the rule. The question remains whether NCA has satisfied all three prerequisites under *Hunt*; the court finds that it has.

The first requirement, that NCA's members or any one of them would have standing to sue in their own right, is clearly met. As corporations doing business in the electrical construction industry, and as signatories to labor agreements with the IBEW, at least some of NCA's members undoubtedly have standing to allege that the NEIF provision was to be inserted into *all* construction contracts in the electrical contracting industry, that the scheme as so defined violated the antitrust laws, and that the violation either caused or threatened to cause them direct, personal damage in the amount of the NEIF assessments. The court does not read *Hunt* to require that *each* of an association's members have independent standing. In this case, it is sufficient that a significant proportion of the association's members are obligated to contribute to the allegedly–illegal NEIF.

NCA has also satisfactorily shown that the interests it seeks to protect are germane to the organization's purpose. Among the association's objectives are "[t]o unite members of the Association in a concerted effort to influence and improve craftsmen efficiency and job performance as well as all other activities affecting operating costs and client relationships" and "[t]o inspire in labor and management a constant adher-

ence to the highest ethical concept of individual and collective social responsibility." NCA Constitution Article II a. and e. Challenging an industry fund which allegedly raises operating costs and allegedly results from an illegal conspiracy between labor and management is certainly pertinent or relevant to NCA's stated purposes. The court does not believe the second prong of the *Hunt* test imposes a stricter standard than that. The defendants argue that NCA cannot prove germaneness because it cannot show that the NEIF has any direct adverse impact on the association's professed goals. However, if that were the test under *Hunt*, the requirement of a showing of direct, personal injury to the association would in effect be reinstated.

In *Hunt* itself, the association whose standing was in dispute was the Washington Apple Advertising Commission, a state agency whose purpose was "protecting and enhancing the market for Washington apples." The Commission had no members in the traditional sense. The Supreme Court first noted that "[i]f the Commission were a voluntary membership organization–a typical trade association–its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court [citing *Warth v. Seldin, supra*]." 432 U.S. at 343, 97 S.Ct. at 2441. In a single sentence, the Court concluded that the Commission's efforts to remedy the injuries allegedly suffered by Washington apple growers was "central" to the Commission's stated purpose. *Id.* at 344, 97 S.Ct. at 2441. As far as establishing germaneness is concerned, NCA's objections are no more abstract and amorphous than those the Court so readily accepted in *Hunt*, especially in light of the fact that NCA *is* a "typical trade association" in the very industry affected by the NEIF.

Although the question is a much closer one, the court is also persuaded that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." The third prong of the *Hunt* test involves two considerations: (1) whether the nature of the claims involves individualized proof, *Hunt, supra*, 432 U.S. at 344, 97 S.Ct. at 2441; and (2) whether the association is competent to speak for its members, *Associated General Contractors v. Otter Tail, supra*, 611 F.2d at 691. For the reasons set forth *infra* in connection with the motion for class certification, the court does not believe the primary issues in the case require individualized proof. The defendants' contention that NCA's members' interests are too diverse to be represented by the association deserves closer analysis.

In *Associated General Contractors v. Otter Tail, supra*, the Eighth Circuit found too many actual and potential conflicts among the members of a trade association to permit the association to speak for all of them. The association sought to enjoin the enforcement of an agreement that the court felt could benefit some members, hurt others, and affect still others not at all. 611 F.2d at 691. The defendants in the case at bar argue that NCA's members have similarly conflicting interests, and point to the fact that many member corporations have not joined in the suit or have voiced their opinion that the NEIF provisions do not injure them. In the court's view, such a "division within NCA" (see Exhibit E to the Reply Memorandum in Support of Defendants' Motion to Dismiss NCA) is not the kind of conflict that requires individual participation in the lawsuit. There is no evidence that any NCA member feels it stands to *benefit* from the NEIF, and that NCA's presence in the litigation therefore works against that member's interest.

The defendants have argued that some NCA members may oppose the suit to the extent it jeopardizes their delicate negotiating relationships with the IBEW. However, the court does not find that argument sufficient to establish the necessity of the allegedly dissenting members' individual participation. To hold otherwise would be to incorporate into the *Hunt* test a sort of adequacy–of–representation standard even more stringent than the one applied under Rule 23(a)(4) on a motion for class certification. *See* Part VI, *infra* at pp. 545–

**522**

543. The plain language of *Hunt*'s third prong does not warrant such a holding. To the extent *Associated General Contractors* implies a different result, this court is not inclined to follow the Eighth Circuit's lead, at least under the circumstances presented by this case.

Because NCA meets all the prerequisites for an association bringing suit on behalf of its members, and because the court knows of no reason why those prerequisites should not apply in an antitrust case, the defendants' motion to dismiss NCA must be denied.

### III. *The Defendants' Motion for Dismissal on the Pleadings*

■ The defendants have moved to dismiss the claims for damages and injunctive relief brought by those plaintiffs who do not hire IBEW labor directly, but instead employ electrical construction contractors who in turn employ IBEW workers. These "indirect–hire" plaintiffs are McKee, Badger, Dravo, Jacobs and Stearns–Roger. The defendants contend that those plaintiffs lack standing under §§ 4 and 16 of the Clayton Act because they cannot show any *direct* injury to themselves proximately caused by the allegedly–illegal NEIF. Although the court agrees that the indirect–hire plaintiffs have no standing to sue for treble damages, the court finds that those plaintiffs are not precluded from seeking injunctive relief. Accordingly, the defendants' motion must be granted in part and denied in part.

The indirect–hire plaintiffs have conceded that their claim for treble damages under § 4 of the Clayton Act is barred by the holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 54 L.Ed.2d 164 (1977). That case established that a plaintiff has no standing to recover monetary damages if he alleges only that the "overcharge" resulting from an illegal price–fixing scheme was passed on to him as an indirect purchaser, through the chain of distribution, in the form of higher costs. The Court reasoned first that such "offensive" use of the passing–on theory should not be

permitted when "defensive" use of the same theory had been prohibited in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); and second that the overcharged direct purchaser in a price–fixing scheme was the only party "injured in his business or property" within the meaning of § 4 of the Clayton Act. *Illinois Brick v. Illinois*, 431 U.S. at 728–29, 97 S.Ct. at 2065–2066. The Court also noted its concern with preventing multiple, overlapping recoveries and with ensuring that damage recoveries would not be so divided as to discourage private enforcement of the antitrust laws. *Id.* at 738, 746–47, 97 S.Ct. at 2070, 2074–2075.

The defendants in the instant case argue that *Illinois Brick* did not consider the implications of the passing–on theory in a suit for injunctive relief under § 16, and that the standing requirements under that section were therefore unaffected by the Supreme Court decision. The defendants contend further that the test under § 16 both before and since *Illinois Brick* has been the "target area" test, which is defined as follows in *NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405, 409–10 (S.D.N.Y.1977):

> In order to have standing to sue under the Clayton Act a plaintiff must show more than that he was injured as a result of an alleged antitrust violation, or even that his injury was foreseeable or intended. He must show that he is "within that area of the economy which is endangered by a breakdown in competitive conditions in a particular industry." In other words, the plaintiff must suffer direct injury as a result of the anti–competitive consequences of the defendants' acts. If not, then he cannot sue even if he has suffered injury as a result of his economic relationship to a target of the conspiracy or to one of the conspirators. [Footnotes omitted.] ·

According to the defendants, the indirect–hire plaintiffs do not pass that test.

■ The court does not agree that the "target area" test is the correct one to

apply when an indirect purchaser seeks only injunctive relief. Even before *Illinois Brick* was decided, the courts were beginning to recognize a distinction between §§ 4 and 16 of the Clayton Act. *Hawaii v. Standard Oil*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *In re Multidistrict Vehicle Air Pollution MDL # 31*, 481 F.2d 122 (9th Cir. 1973). *See* the discussion *supra* in connection with the motion to dismiss NCA. Since 1977, that distinction has been held to permit an indirect purchaser to obtain an injunction as long as he can show the traditional "equitable entitlement" to such relief.

One of the leading cases on point is *Mid-West Paper Products Co. v. Continental Group, supra*, 596 F.2d 573 (3d Cir. 1979). At issue was an alleged conspiracy among manufacturers to fix the price of paper bags used in packaging cookies, coffee, pet foods and the like. The indirect purchasers were supermarkets who bought the prepackaged groceries for resale to their customers. After dismissing the supermarkets' § 4 claims on the authority of *Illinois Brick*, the Third Circuit considered the supermarket plaintiffs' standing under § 16, noting first that the rationales of *Illinois Brick* had no application outside § 4 claims. The court then described the special position of the indirect purchaser:

> For unlike other potential plaintiffs, who may be only remotely affected by the ripples caused by the conspirators' tampering with the supply and demand curve, indirect purchasers can state unequivocally that under all circumstances prevalent in the real economic world, money is passing from their hands into the pockets of the price fixers as a result of the conspiracy, and that no rational pricing decisions by any intermediary will erase this fact. [Footnotes omitted.] 596 F.2d at 593.

The court concluded that indirect purchasers were not precluded from obtaining injunctive relief as long as they could estab-lish that "equity principles" entitled them to it. *Id.* at 594.

The Fifth Circuit reached a similar conclusion in *In re Beef Industry Antitrust Litigation, MDL # 248*, 600 F.2d 1148 (5th Cir. 1979). The plaintiff cattlemen, ranchers and feeders alleged that the defendant supermarkets fixed the price at which beef was purchased from slaughterhouses and packers, and ultimately from the producers. The Fifth Circuit held that the district court had erroneously dismissed the plaintiff's claims for an injunction. Finding that "the policy considerations underlying the pass-on rule are not implicated in claims for injunctive relief," Judge Wisdom then wrote:

> To secure injunctive relief under section 16 of the Clayton Act, the plaintiffs need show only "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. To show a threat of such injury, plaintiffs in a case such as this would not have to show the extent of their harm. It would suffice to show by a preponderance of the evidence that the alleged price-fixing had or will have some adverse impact on the prices they receive for their cattle, or that the conspiracy reduced the packers' demand for fat cattle. 600 F.2d at 1167.

The Eighth Circuit adopted a similar rule in *Paschall v. Kansas City Star Co.*, 605 F.2d 403, 408 (8th Cir. 1979):

> To proceed under section 26, the injunctive relief provision, the plaintiff need only show that there is a threat that he will suffer fact of injury and that such threatened fact of injury is causally related to the defendant's pending antitrust violation. [Footnotes omitted.] [3]

Judge Watkins of this court, in *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091 (D.Md., 1979), relied on the Third and Fifth Circuit decisions to hold that *Illinois Brick* did not preclude injunctive relief for indirect purchasers, but that the plaintiff "must still establish, as § 16 requires, that

---

**3.** *Paschall* involved alleged violations of § 2 of the Sherman Act rather than price-fixing, and did not discuss purchasers. However, nothing in the court's interpretation of § 16 tended to limit that interpretation to the given facts.

principles of equity entitle it to such injunctive relief." *Id.*, 1105.

The defendants in the present action cite several cases for the proposition that an antitrust plaintiff may never have standing, under § 4 or § 16, unless the plaintiff can show *direct* injury. In *NAACP v. New York Clearing House, supra*, 431 F.Supp. 405 (S.D.N.Y.1977), the court held that the standing requirements developed in treble damage suits applied to actions for injunctions as well. Although Judge Weinfeld acknowledged that the Supreme Court had recognized a distinction between the requirements of §§ 4 and 16, he was bound by the Second Circuit's consistent application of the "target area" test to claims for injunctive as well as monetary relief. *See, e. g., Nassau County Ass'n of Insurance Agents, Inc. v. Aetna Life & Casualty Co.*, 497 F.2d 1151 (2d Cir.), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *Long Island Lighting Co. v. Standard Oil Co. of Cal.*, 521 F.2d 1269 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976). The defendants also cite *Parkview Markets, Inc. v. Kroger Co.*, 1978–2 Trade Cases ¶ 62,373 (S.D.Ohio 1978), in which the court found that the reasoning of *Illinois Brick* did preclude the plaintiffs' requested injunction.

This court is not persuaded that the cases the defendants have cited state the controlling rule of law. To begin with, the majority of those cases are from the Second Circuit, whose acknowledged rule rejecting the distinction between §§ 4 and 16 has not been adopted in the Fourth Circuit. Moreover, because *Parkview Markets* does not focus on an indirect purchaser claiming threatened injury from a price–fixing scheme, the case sheds little light on the question of when such a plaintiff's alleged injury should be considered too remote. Many of the other cases the defendants cite were decided prior to cases such as *Mid–West Paper* and *Paschall, supra*, and in the court's view do not reflect the most recent developments in this area of the law.

In sum, the weight of authority compels the conclusion that in order to have standing to sue for injunctive relief under § 16, an indirect purchaser must show only an "equitable entitlement" to such relief. The court interprets that requirement to mean that the plaintiffs must (1) "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contempora[neous] violation likely to continue or recur," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), and (2) show that the threatened injury is proximately caused by the antitrust violation. *Mid–West Paper v. Continental, supra*, 596 F.2d at 594; *In Re Beef Industry Antitrust Litigation, supra*, 600 F.2d at 1167; *Paschall v. Kansas City Star, supra*, 605 F.2d at 409.

The violation which the indirect–hire plaintiffs here allege is the defendants' continuing conspiracy to fix, maintain and stabilize the price of contracts with the IBEW. A scheme which raises a *direct*–hire contractor's cost of procuring IBEW labor very plainly threatens to raise the indirect–hire company's cost of employing that contractor. There is also a definite causal link between any overcharge illegally exacted from those who contract directly for IBEW labor and the threat that the overcharge will be passed on and therefore affect the indirect–hires' own cost of doing business. *Cf. Mid–West v. Continental, supra*, 596 F.2d at 593. Even if the effect on them is secondary and indirect, the plaintiffs in question are close enough to the "ripples" of the conspiracy to be entitled, under general principles of equity, to seek to enjoin the activity which threatens them. The harm they anticipate is clearly definable, and they are only one step removed from the employers who are directly affected by the alleged antitrust violation. The indirect–hire plaintiffs therefore have standing to seek injunctive relief under § 16, and the defendants' motion to dismiss the plaintiffs' claims under that section must be denied. However the motion must be granted with respect to the indirect–hires' claims for damages under § 4.

## IV. Motion of Defendants Colgan and Miller to Dismiss Complaint

Defendants Colgan Electric Co. and Miller Electric Co. have moved to dismiss the complaint as to each of them, on two grounds: first, that venue does not lie in this district as to either of them, and second, that the complaint fails to state a claim against either Colgan or Miller on which relief can be granted. Although the question is a close one, the court is of the view that venue *is* proper in this district. And under the liberal rules of pleading, the allegations of the amended complaint are sufficient to withstand the defendants' motion to dismiss for failure to state a claim.

The starting point for an analysis of venue in connection with a corporate defendant in an antitrust case is the special venue provisions of § 12 of the Clayton Act, 15 U.S.C. § 22:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The parties do not dispute that Colgan and Miller are neither inhabitants of nor found in the District of Maryland. The only issue at this stage of the analysis is therefore whether one or more of the defendant corporations "transacts business" in this district.

In general, the concept of "transacting business" is to be broadly defined, in order to facilitate actions against antitrust violators in the district where the injuries occurred and where the injured plaintiffs are at home. *Learning Systems, Inc. v. Levin*, 351 F.Supp. 532 (E.D.Mo.1972); *National Auto Brokers Corp. v. General Motors Corp.*, 332 F.Supp. 280 (S.D.N.Y.1971); *L. S. Good & Co. v. H. Daroff & Sons*, 263

F.Supp. 635 (N.D.W.Va.1967). To that end, the test of venue is "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948); *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123, 128 (D.N.H.1975); *Donlan v. Carvel*, 193 F.Supp. 246, 248 (D.Md.1961). Beyond those general guidelines, the determination whether a corporation is transacting business within a particular district must ultimately be made on a case–by–case basis, according to the particular facts presented. *Grappone v. Subaru, supra*, 403 F.Supp. at 128; *United States v. Scophony, supra*, 333 U.S. at 819, 68 S.Ct. at 867 (Frankfurter, J., concurring).

The facts concerning Colgan's and Miller's business transactions in Maryland do not make it readily apparent whether the corporations' commercial contacts with the district have been "substantial" or not.[4] Affidavits submitted by the president of each corporation attest that neither defendant has made or solicited sales, performed services or advertised its business in Maryland. Neither corporation has been qualified to do business here, has had a resident agent, place of business, address, telephone or bank account here, or has owned property here. However, the plaintiffs contend that both corporations have engaged in certain transactions in Maryland which make venue in this district appropriate under 15 U.S.C. § 22.

The most important of the transactions the plaintiffs cite are Colgan's and Miller's purchases of services from the National Electrical Contractors Association through the association's headquarters in Bethesda, Maryland. Colgan has been an active member of NECA since 1949; Miller since 1932. Both corporations have paid NECA dues and additional service charges in exchange for such benefits as "labor relations services, marketing services, public relations

---

4. For venue purposes, a defendant's contacts with a district are scrutinized as of the time of the alleged antitrust violations; that is, when the cause of action accrued. *Board of County Commissioners v. Wilshire Oil Co.*, 523 F.2d 125 (10th Cir. 1975); *Eastland Construction Co. v. Keasbey and Mattison Co.*, 358 F.2d 777 (9th Cir. 1966).

services, representation with congressional bodies ... [and] electrical code making services," Colgan deposition of March 17, 1978, at 71, and various NECA publications, Autrey deposition of March 23, 1978 at 53–60. Representatives of both companies testified at their depositions that their companies' memberships in NECA were highly beneficial and valuable. Colgan deposition at 71, 72 and 77; Autrey deposition at 55–56. Between 1970 and 1977, before the NEIF went into effect, Colgan and Miller paid NECA [5] the following amounts annually:

| | Colgan | Miller |
|------|--------|--------|
| 1970 | $ 2,824.55 | $ 3,025.11 |
| 1971 | 3,354.09 | 3,113.03 |
| 1972 | 3,621.61 | 3,733.65 |
| 1973 | 3,708.60 | 3,934.55 |
| 1974 | 5,060.00 | 5,310.00 |
| 1975 | 6,340.00 | 8,256.58 |
| 1976 | 7,129.00 | 9,925.00 |
| 1977 | 11,542.00 | 7,117.00 |

Answers of Colgan and Miller to plaintiffs' interrogatory no. 23, first set. Beginning in July 1977, each corporation made payments into the NEIF to support NECA services; 20% of those payments went directly to the association's national office in Bethesda. In the last six months of 1977, Colgan's NEIF payments totalled approximately $19,000, and Miller's approximately $41,000. Although the plaintiffs assert that they have been unable to obtain comparable information for the years 1978 and 1979, they contend that the corporations' total payments for NECA services has undoubtedly increased since 1977. Motions Hearing Transcript, December 21, 1979, at 1053.

The corporations' transactions with NECA are the primary foundation for the plaintiffs' argument that venue is appropriate in this district. However, the plaintiffs cite some additional transactions between the defendants and Maryland companies. Between 1971 and 1979, Colgan repeatedly and continuously purchased tool parts and repair services from the Black & Decker Company, which handled the billing and invoicing through its office in Towson,

Maryland. The annual expenditure was anywhere from approximately $2,300 in 1972 to approximately $180 in 1977. Plaintiffs' Opposition to Motion to Dismiss of Colgan and Miller (hereinafter "Plaintiffs' Opposition") at 7. Miller conducted similar transactions with Black & Decker, but only in the amount of $400–$500 a year. In 1974, Colgan sold $471.63 worth of "computer forms" to the Arundel Asphalt Company in District Heights, Maryland. The plaintiffs also contend that Colgan was "transacting business" with the Rouse Company of Columbia, Maryland. Rouse had two construction projects in Florida and Ohio, on which Colgan worked as a subcontractor for the Lathrop Company. Although Colgan had no contractual relationship with Rouse, the plaintiffs argue that "Colgan was intimately involved with Rouse in performing these projects." Plaintiffs' Opposition at 8.

The court finds that none of the two defendants' dealings with Black & Decker, Arundel Asphalt or Rouse was substantial enough to qualify as "transacting business." Colgan's link with Rouse is too indirect. A single sale of computer forms for just over $400 is hardly continuous or substantial enough to justify subjecting Colgan to venue here. Although the Black & Decker purchases were more regular and longer-lived, their total value over a seven–year period was only about $6,700 for Colgan and $2,800–$3,500 for Miller. The total for the four years prior to the end of 1976, when the National Agreement was signed, was only about $2,541. In short, the question whether venue is appropriate in Maryland as to defendants Colgan and Miller under § 12 of the Clayton Act depends on whether the corporations' purchases of services from NECA in Bethesda constitutes "transacting business" within the meaning of the statute.

The defendants cite *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 309 F.Supp. 1053 (E.D. Pa.1969), for the proposition that active

---

**5.** The amounts represent the percentage of payments made to the local chapters which ultimately went to National NECA in Bethesda. Colgan deposition at 85–86.

membership in a trade association whose head office is in a particular district is alone insufficient to establish venue in that district. *Id.* at 1055. In *Philadelphia Housing*, two corporate defendants moved to dismiss the antitrust actions against them on the grounds that venue was improper in the District of Columbia. The plaintiffs maintained that both defendants were active members of a trade association whose meetings they regularly attended in the District; that both had employed the association to perform services on the corporations' behalf; and that the president of one of the corporations had at one time served as an officer of the association. Judge Lord of the Eastern District of Pennsylvania found nothing in the corporations' relationship to the association that would constitute "transacting business" for venue purposes. *Id.* at 1055. Colgan and Miller argue by analogy that because their purchases of services from NECA are part of their active membership in the association, those dealings cannot be characterized as business transactions.

■■■ The court agrees that it would be anomalous to confer venue as to a corporation merely because the corporation has joined a trade association headquartered in a given district. The court also agrees with Judge Lord's conclusion that mere attendance at a trade association meeting, or the fact that a corporation's president is an officer of the association, does not mean that the corporation "transacts business" in the association's home district. However, the facts of the present case are distinguishable from and more complex than those Judge Lord considered. Both Colgan and Miller expended somewhere in the neighborhood of $44,000 between 1970 and mid–1977 for the services NECA provided. Each corporation considered its membership in the association to be a highly important aspect of its business activities, and took every opportunity to make that membership known to others. Robert Colgan, president

of Colgan Electric, wrote an article in the Electrical Contractor Magazine (a NECA publication) in September, 1976, in which he averred that his company's investment in NECA was an investment in his business, the entire industry, and even in the country. Exhibit B to Plaintiffs' Opposition. In the same vein, H. E. Autrey, president of Miller, testified at his deposition that membership in NECA was the corporation's "total way of life in the construction industry." Autrey deposition at 55–56. The nature of the NECA·services themselves indicates how intimately related they were to the conduct of the two corporations' business: NECA assisted in collective bargaining, marketing, public relations and political lobbying, among other services.

When a corporation regularly and continuously expends several thousand dollars a year to procure a wide variety of services which it deems integral to the conduct of its business, the corporation's affiliation with the association goes beyond the kind of membership discussed in *Philadelphia Housing*, characterized only by attendance at meetings and service as an officer of the association.[6] When the expenditures total at least $44,000 for the seven years immediately preceding and during the formation of the supposedly illegal conspiracy, the transactions involved are "substantial" within the meaning of *United States v. Scophony, supra*, 333 U.S. at 807, 68 S.Ct. at 861. It is the continuity of the transactions and their importance to the companies,·as well as the dollar amounts, which lead the court to conclude that both Colgan and Miller were and are "transacting business" with NECA within the meaning of 15 U.S.C. § 22. Furthermore, although many of the companies' dealings with NECA were through the local chapters, the court finds that both Miller and Colgan were in effect "transacting business" with national NECA in Bethesda, Maryland, as well as with the local chapters. The payments listed above went to

---

**6.** Although the corporations in *Philadelphia Housing* were alleged to have employed the trade association there "to perform services on their behalf," 309 F.Supp. at 1055, there is no indication that the services were as extensive and/or considered as valuable as those offered by NECA. Furthermore, Judge Lord did not even address the allegation.

the national headquarters in Maryland, in return for the services both companies prized very highly. Publications and other materials distributed through the local chapters were developed and produced at the association's national headquarters. Autrey deposition at 54–55; Colgan deposition at 72. It would be not only unrealistic, but also contrary to the liberal interpretation afforded § 22, to deny that the two companies' transactions with NECA were transactions with an association in the state of Maryland.

For all of the foregoing reasons, the court has concluded that venue will lie in this district as to both Colgan and Miller. The complaint therefore cannot be dismissed for lack of venue. The defendants' second ground for their motion to dismiss—that the complaint fails to state a claim on which relief can be granted—is similarly without merit.

 A complaint will survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure "unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." 2A *Moore's Federal Practice* ¶ 12.-08 at 2274 (2d ed. 1970); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *George C. Frey v. Pine Hill Concrete*, 554 F.2d 551 (2d Cir. 1977). The general test for adequacy of the pleadings under Rule 8 of the Federal Rules is whether the statement of the claim contains the required elements, stated plainly and succinctly, and whether it gives the opposing party fair notice of the nature and basis of the claim. 2A *Moore's Federal Practice* ¶ 8.17[1] (2d ed. 1979); *Conley v. Gibson, supra; Local 1852 v. Amstar Corp.*, 363 F.Supp. 1026 (D.Md.1973), aff'd, 508 F.2d 839 (4th Cir. 1974), cert. denied, 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975). The more specific requirements for an allegation of conspiracy are that the pleader provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; "[i]t is not enough merely to state that a conspiracy has taken place." 2A *Moore's Federal*

*Practice* ¶ 8.17[5] (2d ed.1979); *Heart Disease Research Foundation v. General Motors*, 463 F.2d 98 (2d Cir. 1972); *Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 701–02 (E.D.Pa.1973). Nevertheless, the pleader should be allowed considerable leeway, and the provision of further details may be left to discovery. 2A *Moore's Federal Practice* ¶ 18.17[5] at n. 5. On the whole, courts should be slow to dismiss an action on the pleadings, especially when antitrust violations are alleged. *Hospital Building Co. v. Trustees of Rex Hospital*, 511 F.2d 678 (4th Cir. 1975), rev'd on other grounds, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); *Burch v. Goodyear Tire & Rubber Co.*, 420 F.Supp. 82 (D.Md.1976), aff'd, 554 F.2d 633 (4th Cir. 1977).

 In light of those principles of pleading, the court is satisfied that the plaintiffs' amended complaint gives a sufficiently clear and succinct description of the alleged conspiracy, with enough details as to time and place, to give both Colgan and Miller notice of the basis of the claim against them. Although neither corporation is mentioned by name in the section of the complaint which describes the alleged antitrust violation in detail, paragraphs 4(e) and (f) of the complaint plainly assert that each corporation "has performed acts in furtherance of the conspiracies alleged herein." The more detailed explanation in paragraphs 20–25 provides ample notice of the time, nature and purported effects of the conspiracy. Although neither Colgan's nor Miller's precise role in the conspiracy is outlined, the discovery process is the proper tool for exploring such detail. In fact, discovery has revealed additional information which further convinces the court that the plaintiffs can show some set of facts, based on the pleadings, that might entitle the plaintiffs to relief against Colgan and Miller. *See* Part V, *infra*.

Because a dismissal on the pleadings is unwarranted under the circumstances of

this case, and because venue is proper in the District of Maryland as to both Colgan and Miller, the motion of those two defendants to dismiss the complaint as to them must be denied.

## V. *Plaintiffs' and Defendants' Cross–Motions for Summary Judgment on the Plaintiffs' Claims*

The plaintiffs' motion for summary judgment on their own claims, as opposed to the defendants' counterclaims, seeks a declaratory judgment that Article Six of the NECA–IBEW National Agreement constitutes a *per se* violation of § 1 of the Sherman Act,[7] in that the agreement amounts to a conspiracy to fix, maintain and stabilize the cost of contracts with the IBEW. The defendants' cross–motion seeks summary judgment on the plaintiffs' price–fixing allegations, on the grounds that the allegations fail to state a claim on which relief can be granted. In the court's view, the undisputed facts presented in the record show that the defendants' agreement to set up and implement the National Electrical Industry Fund *was* a price–fixing agreement illegal *per se*. The plaintiffs are entitled to summary judgment on that issue, and the defendants' cross–motion must be denied.

■■■ On any motion for summary judgment, the moving party must show that there are no genuine disputes as to any material fact, and that the movant is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). *See also Fli–Back Co., Inc. v. Philadelphia Manufacturers Mutual Insurance Co.*, 502 F.2d 214, 218 (4th Cir. 1974). The starting point for an analysis of both the facts and the law in the present case is *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In *Socony*, the Court held:

> Under the Sherman Act a combination formed for the purpose and with the ef-

fect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*. [*Id.* at 223, 60 S.Ct. at 844.]

· · · · ·

> ... But that does not mean that both a purpose and a power to fix prices are necessary for the establishment of a conspiracy under § 1 of the Sherman Act.... It is the "contract, combination ... or conspiracy in restraint of trade or commerce" which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other ... In view of these considerations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity.

*Id.* at 225 n.59, 60 S.Ct. at 845.

### A. *The Agreement*

The existence of an agreement between NECA and the IBEW is undisputed. It is rare in an antitrust case that the court need not construe a combination or conspiracy solely from the speeches, correspondence and meetings of the defendants. In the present case, the court has before it not only voluminous records of such speeches, correspondence and meetings, but also a copy of the exact terms of the defendants' agreement, reduced to writing and signed by representatives of NECA and the IBEW on December 8, 1976.

Although the fact of an agreement is undisputed, the application of the antitrust laws depends on *what* the defendants agreed to do. By its terms, Article Six of the National Agreement (quoted in Part I above) establishes the NEIF, and then provides that each individual employer will

---

**7.** Section 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

contribute to the fund 1% of his gross labor payroll every month. Most importantly, Article Six provides that the 1% payment obligation will be inserted into *"[a]ll* construction agreements in the electrical industry" (emphasis added). That language is critical, because it shows that the NEIF was to apply to *all* electrical contractors, and not just to those who were members of NECA or who were affiliated with NECA as nonmember signatories to Letters of Assent, Project Agreements or International Agreements.

The plain language of Article Six, indicating that *all* construction agreements were to be affected, is corroborated by the language of the National Agreement as a whole. The preamble states, "The *appropriate* contents of this agreement and the enabling clauses herein shall be inserted in all agreements between the parties and in all construction agreements between the Local Unions of the IBEW and the Local Chapters of NECA." (Emphasis added.) The preamble does not state unequivocally that *all* contents of the agreement will be inserted in only NECA–IBEW contracts. Articles Three, Four and Five, dealing with shift work, management rights and apprentice ratios, specifically provide that their language is to be inserted in agreements between local IBEW unions and local NECA chapters, while that language is conspicuously missing from Article Six. That distinction, combined with the qualifying word "appropriate" in the preamble, demonstrates that the parties agreed to insert the NEIF provisions in *all* contracts without regard to NECA affiliation.

That conclusion is further buttressed by a document entitled "Basic Understandings and Interpretations of the IBEW–NECA Agreement," also signed on December 8, 1976 by Robert Higgins for NECA and Charles Pillard for the IBEW. The memorandum clarifies how each article of the National Agreement is to be interpreted and applied. Under Article Six, the document states that "the intent of this Article is to insert the industry fund contribution language in all IBEW construction agreements containing the NEBF language

. . . ." An affidavit of Marcus Loftis, Administrative Assistant to the International President of the IBEW, explains which contracts contained the NEBF language. Mr. Loftis submitted the affidavit to the United States District Court for the District of Alaska on July 1st, 1977 in connection with *Case v. IBEW*, 438 F.Supp. 856. Paragraph 7 of the affidavit states:

> Since the inception of the pension benefit contributions in 1946, both the affiliated construction Locals and the electrical contractors, be they affiliated members of Chapters of NECA, members of other employer associations, or independent contractors, have always included within the terms of their collective bargaining agreements the one percent gross payroll benefit contribution to NEBF.

Exhibit 48 to plaintiffs' motion for summary judgment. If the reach of the NEIF was to be as extensive as that of the NEBF, it is clear that the language of Article Six was not subject to the limiting provisions of the preamble or the other articles of the National Agreement.

That interpretation is also supported by a letter from Henry H. Glassie to Robert L. Higgins, Executive Vice President of NECA, on October 7, 1976. Mr. Glassie is an attorney whom Higgins had consulted on the question whether NECA's adoption and implementation of the National Agreement would require a formal amendment of NECA's bylaws. Mr. Glassie responded in his letter as follows:

> If the Industry Fund provided for in Article 6 of the agreement referred to in Proposal # 3 applied to NECA members as such, a change in the By–Laws would be involved. However, we are informed the contribution to this fund as provided in Article 6 will be required of all union electrical contractors whether they are members of NECA or not–indeed would be applicable to a company after resignation from NECA; and moreover, that the contribution will not be required of non–union members of NECA. Accordingly, on balance, it is our opinion that the adoption of Ordinary Proposal # 3 would

not require the formality of an amendment of the By–Laws.[8]

There are other documents in the record which reinforce the conclusion that NECA and the IBEW intended to obtain NEIF payments from all electrical contractors employing IBEW labor. Among them are Exhibit 30 to the plaintiffs' motion, a letter dated October 26, 1976 from H. E. Autrey, then president of defendant Miller Electrical Company, to A. M. Scherffius of the E. I. duPont de Nemours Company; Exhibit 33, the November 1976 issue of Electrical Contractor Magazine; Exhibit 14, a NECA "Chapter Alert" dated December 20, 1976; Exhibit 28, a letter dated December 28, 1976 from Charles Pillard to "All Local Unions Who Have Agreements Containing the 1% NEBF Clause;" and Exhibit 31, a letter dated January 3, 1977 from Mark Hughes to Bernard Healey. The materials submitted by the defendants to support a different interpretation of Article Six are temporally far removed from the formation of the National Agreement itself, and are therefore so likely to be self–serving that in the court's view, they fail to create a genuine factual dispute.

## B. *Anticompetitive Purpose*

Although it is clear *what* the defendants agreed to do, the question remains whether the purpose behind the agreement was to achieve some end forbidden by the antitrust laws. The plaintiffs contend that the NEIF provisions were designed to ensure that all electrical contractors employing IBEW labor would pay a higher price for procuring that labor, with the amount of the increase going to pay for industry services provided by NECA. The ultimate aim of the price manipulation, according to the plaintiffs, was to eliminate the competitive advantage in bidding which non–NECA contractors enjoyed by virtue of not having to include NECA dues in their cost of doing business. NECA was allegedly suffering from what the plaintiffs describe as a "Jehovah complex": the association felt it was providing valuable services to the entire electrical construction industry, and felt it was justified in compelling all the beneficiaries to pay for the services.

Because the crux of the plaintiffs' claim is an allegation of price–fixing, and because the plaintiffs allege that the price fixed was that of contracts with the IBEW, the court must decide the preliminary issue whether § 6 of the Clayton Act, 15 U.S.C. § 17, imposes a bar to the plaintiffs' action.

The first sentence of § 6 asserts that "[t]he labor of a human being is not a commodity or article of commerce."[9] Ordinarily, the courts have interpreted that sentence to exclude from the antitrust laws any alleged restraints on the labor market itself. *Carroll v. Protection Maritime Insurance Co., Ltd.,* 512 F.2d 4 (1st Cir. 1975); *Nichols v. Spencer International Press,* 371 F.2d 332 (7th Cir. 1967); *Kennedy v. Long Island Railroad Co.,* 319 F.2d 366 (2d Cir.), *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963). *See also* A. Cox, *Labor and the Antitrust Laws–A Preliminary Analysis,* 104 U.Pa.L.Rev. 252, 254 (1955).

---

**8.** After the plaintiffs submitted the letter to the court, the defendants took Mr. Glassie's deposition in order to establish what he had intended to say in the letter. Before he was deposed, the defendants told Mr. Glassie that a letter he had written in 1976 was going to be interpreted as implying that non–members of NECA would be forced to pay into the NEIF. Glassie deposition at 34. Because the deponent was thereby "primed" to refute that interpretation, and because the deposition was taken some three and one–half years after the letter was written, the letter is still persuasive support for the fact that the defendants meant to insert the NEIF provision into *all* electrical industry construction agreements.

**9.** The full text of § 6 reads:

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

The primary rationale behind the court's interpretation is that Congress in § 6 meant to guarantee that the lawful activities of labor organizations would not be subject to the antitrust laws, and to that end, Congress excluded the labor market altogether as one in which trade could be restrained. 51 Cong.Rec. 14018 (1914). Consequently, there can be no antitrust violation unless some restraint on competition in a commercial market for goods or services is at issue. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940); *Armco Steel Corp. v. UMW,* 505 F.2d 1129, 1134 (4th Cir. 1974); *Kennedy v. Long Island Railroad Co., supra,* 319 F.2d at 373.

The defendants argue that the price of a contract for labor is indistinguishable from the price of labor itself, and that the plaintiffs' antitrust allegations therefore cannot survive application of § 6 of the Clayton Act. Although the court would ordinarily agree, the facts of this case make it possible to distinguish between the price or cost of labor and the price of procuring a contract for that labor.

Under most circumstances, the cost of labor is the amount an employer pays, *to the benefit of his employees,* in return for their services. The ultimate price of the labor may be broken down into several components, including wages, health care benefits, pension contributions and bonuses. Yet each component is a benefit to the employee, paid in exchange for his labor. Any supposed restraints on the determination of the aggregate price are not within the ambit of the antitrust laws, because the "item" whose price is involved is the labor of a human being.

· In the present case, however, one element of the price electrical contractors were to be required to pay for IBEW labor was not to be paid to employees at all. NEIF contributions were to be paid directly into a fund controlled wholly by NECA and set up for the purpose of financing NECA's services. The benefits flowing from the payments were to go to *employers* in the industry, whether or not the employers would otherwise want the benefits or choose to pur-

chase them. In no sense does Article Six of the National Agreement reflect an amount that IBEW laborers charge *for their labor.* It instead represents a charge which an employer group and the union agreed *all* employers in the electrical construction industry would have to pay, in addition to employee compensation, in order to procure a contract with the IBEW. In the court's view, the price of a labor contract under those circumstances is distinguishable from the price of labor itself, and might therefore be subject to illegal manipulation.

Nevertheless, the distinction would be irrelevant if the plaintiffs were alleging an illegal restraint on the labor market itself. In other words, if the plaintiffs claimed that manipulation of the cost of procuring labor interfered with their freedom or ability to hire workers, the court would have no trouble dismissing the claims on the authority of *Kennedy v. Long Island Railroad, supra, Apex Hosiery, supra,* and *Armco Steel, supra.* In the instant case, however, the heart of the complaint is the alleged restraint on competition in the market for electrical construction services. Those services are clearly within a commercial market subject to the antitrust laws. Because of the combination of circumstances here–the price of a labor contract is distinguishable from the price of labor *and* the plaintiffs do not allege any restraint on competition in the labor market itself–the court finds that § 6 of the Clayton Act is no bar to the present action.

In order to link the alleged manipulation of the price of labor contracts with the alleged restraint on competition, and in order to determine that Article Six of the National Agreement constitutes a price–fixing conspiracy illegal *per se,* the court must be satisfied that there is no genuine factual dispute as to the defendants' anti-competitive purpose in establishing and implementing the NEIF. *United States v. Socony, supra,* 310 U.S. at 223, 60 S.Ct. at 844; *United States v. National Society of Professional Engineers,* 555 F.2d 978, 983 (D.C.Cir. 1977), *aff'd,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *State of Arizo-*

na v. *Cook Paint & Varnish Co.*, 391 F.Supp. 962, 965–67 (D.Ariz.1975), *aff'd*, 541 F.2d 226 (9th Cir. 1976), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977).

The plaintiffs take the position that the "NECA defendants"–that is, all defendants except the IBEW and Charles Pillard–conceived of the NEIF as a means to eliminate the competitive bidding advantage non–NECA–members enjoyed by virtue of not having to pay NECA dues to support the association's services to the industry. By ensuring that every contractor in the electrical construction industry employing IBEW labor [10] contributed to the cost of NECA services according to a defined formula, the NECA defendants allegedly sought to equalize every contractor's cost of doing business and destroy the non–NECA–members' competitive advantage. In order to implement the plan, NECA enlisted the help and bargaining power of the IBEW, which agreed to the scheme as a concession to management, in return for the advantageous provisions of the National Agreement concerning pension benefits, shift work and apprentice ratios.

The record reveals that there is no genuine factual dispute over the accuracy of the plaintiffs' contentions. One of the most compelling portions of the record is the transcript of a speech made by Robert Colgan, then President of NECA, to the District 1 NECA Council meeting at Sutton, Massachusetts on September 10, 1976. Although NECA and the IBEW had announced their proposed agreement in the spring of 1976, it could not become official until approved by the local chapters. Accordingly, Colgan and other NECA officials traveled around the country in the summer and fall of 1976, meeting with the local chapters and encouraging them to approve the agreement.

In his September 10th speech in Massachusetts, Colgan discussed how the insertion of the NEIF into collective bargaining agreements would eliminate non–NECA contractors' cost advantage:

I don't want a national constructor going to our customers and say I have an international agreement and I can employ your people, or I can employ IBEW people and *I have an advantage over them because I don't have to pay any percentage on top of my payroll.* Now many of you say who's going to assure that the national constructors will pay this bill. It isn't a hundred percent positive that the national constructors will pay this bill, but they have international agreements with the very people that we're negotiating this agreement with, and in the majority of the cases they agree to operate under the terms of the local bargaining agreement, and by the way this is if it becomes part of a bargaining agreement this is a legal industry fund and it has been put to the test before it was every [sic] put into this proposal. I'm saying that I think that the work that we have done over the years deserves somebody else who's getting the benefits from it to help pay for the way that we have helped this industry grow. *I have all of my life I have always resented those people who felt if it was an opportunity for them to remain on the outside to employ IBEW people and say I don't have to pay that bill, if you get a NECA contractor it's going to cost you more money.* I want that in the bargaining agreement and as you all know most of it is in the bargaining agreement. I want it in the bargaining agreement because so that the people who agree to operate by the local agreements will abide by that agreement. That's the way I feel about it. That is part of the dream that I have and I will admit there are going to be if it would be passed and I know many of you have taken votes against it. If it were passed it will be put to the test, but in general you will find that the people are willing to accept the other conditions that they

---

**10.** The IBEW is virtually the only union in the country to have organized workers in the electrical construction industry. Almost every union job in the industry employs IBEW labor.

Plaintiff's Memorandum in Support of Motion for Determination of This Suit as a Class Action, at 7–8.

get with this along with abiding by the local agreements. *I think it's an advantage to you as contractors to stabilize your industry in this manner.* I realize that no one can come out and compete against the non–union rates but they can compete against some of the conditions that non–union people will be able to operate under better able to operate under. I firmly believe that we can get closer to them and closer to our customers if we do some of the things they have been complaining about. And yet they are the very same people that are telling us that we are raising their cost. I do not believe we are raising their costs. *I believe we are putting an adder on top of what their effective lower cost is.*

Exhibit 7 to Plaintiffs' Motion for Summary Judgment at 6–7 (emphasis added). As the record makes clear, the "adder" was to be applied to *all* contractors with the IBEW, not just contracts negotiated between NECA and the union.

The anticompetitive purpose so apparent in Mr. Colgan's speech is further documented by affidavits submitted and statements of counsel made in connection with some of the collection cases pending in other courts. Each of three affidavits sworn to by NECA chapter managers contained the following explanation of the necessity for collecting NEIF payments:

> Over the years of my association with the electrical contracting industry, I have frequently seen situations where the difference between the successful bid for a contract and the next lowest bid was much less than 1% of the successful contractor's anticipated payroll expenses for the project. This is because material and labor costs vary little between competing contractors. If the Howard P. Foley Company and other contractors are permitted to evade payment of 1% of their payroll costs to the NEIF they will, thus, be placed in a highly unfair competitive position with respect to other contractors who continue to observe their contractual obligation in this regard.

Exhibits 2, 3 and 4 to Plaintiffs' Motion for Summary Judgment, at pages 5, 4 and 4–5 respectively.

At a hearing in a collection case in the Federal District Court in Los Angeles, counsel for the NEIF, Stanley Tobin, insisted that the 1% payments required under Article Six could have a decisive effect on a contractor's competitive bidding advantage.

MR. TOBIN: ... What is important here, your Honor, is that these national contractors [who refuse to pay into the NEIF] ... are going to get an extra boost. *They are going to be able to be so competitively placed that they have an advantage over the local contractors, members of the local [NECA] chapter.* They will not have to pay pending all this litigation which can go on for years in Maryland. They will not have to pay one cent towards this fund which every other contractor here will have to pay.

\* \* \* \* \* \*

MR. TOBIN: ... That is exactly the point. In the interim *[the contractor refusing to pay] is getting a competitive advantage over everyone else. He, therefore, gets the bids. He can beat them out.* There is nothing that anybody can get from it thereafterwards. We are coming in here merely for his allowance. That is number one.

Number two, and perhaps even more important, he doesn't pay his competitors–the hundreds and hundreds of other electrical contractors that are situated in Southern California–they see he gets away with that one percent. *That one percent is a big thing.*

Exhibit 5 to Plaintiff's Motion for Summary Judgment at 8, 12 (emphasis added).

■ The undisputed facts discussed so far establish that NECA and the IBEW entered into a written agreement to add a surcharge, determined by a uniform formula, to the cost of procuring *all* contracts with the IBEW in the electrical construction industry. The facts also establish that the purpose of the agreement was to eliminate competition between NECA members and non–NECA–members in bidding for

projects in the industry. In the court's view, those facts are sufficient to establish a price–fixing scheme which is *per se* illegal under the line of authority rooted in *United States v. Trenton Potteries*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), expressed most clearly in *United States v. Socony, supra*, and reaffirmed in cases such as *United States v. Container Corporation of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); and *Catalano, Inc. v. Target Sales, Inc.*, —— U.S. ——, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In order to clarify its view, the court will address some of the defendants' arguments that there has been no *per se* violation of § 1.

### C. *The Defendants' Arguments*

#### 1. *Applicability of the* Per Se *Rule*

One of the defendants' arguments is that the conduct of NECA and the IBEW alleged to be illegal does not fall within any of the categories the courts have already deemed to be *per se* violations of the Sherman Act. There are two parts to the argument: First, the National Agreement cannot amount to a price–fixing conspiracy illegal *per se* because it is neither a horizontal agreement between competitors nor a vertical agreement between links in a chain of distribution; and second, the court needs to know more about the actual effect of the National Agreement on competition before the court can determine whether the arrangement should be classified as a *per se* violation. *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); *Evans v. S.S. Kresge Co.*, 544 F.2d 1184, 1192 (3d Cir. 1976), *cert.*

*denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). The defendants conclude that if the scheme were tested under the standards set out in *Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), it would not warrant *per se* treatment, but would instead have to be analyzed under the Rule of Reason.[11]

█ The court is not persuaded that an arrangement designed to fix the price of procuring labor contracts cannot be a *per se* illegal price–fixing agreement merely because it is neither horizontal nor vertical in the traditional sense. In the three district court cases cited by the defendants, the courts rejected the *per se* price–fixing theories not just because the agreements at issue were neither horizontal nor vertical, but because there was no indication of any interference with free market forces through price manipulation.[12] In the present case, on the other hand, the ultimate purpose of the National Agreement was to interfere with the price NECA members' competitors could charge for their services. By putting an "adder" on the competitors' cost of procuring labor, NECA through its agreement with the IBEW aimed to stabilize operating costs in the industry and thereby eliminate bidding competition.

The case of *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), makes it clear that it is such *restraint on price competition*, rather than the characterization of an agreement as horizontal or vertical, which is the essence of a *per se* violation. In *General Motors*, three associations made up of franchised Chevrolet dealers in the Los Angeles

---

11. In *Northern Pacific*, the Supreme Court explained the principle of *per se* unreasonableness as follows:

However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. 356 U.S. at 5, 78 S.Ct. at 518.

12. *West Texas Utilities Co. v. Texas Electric Service Co.*, 470 F.Supp. 798 (N.D.Tex.1979); *Mortenson v. First Federal Savings & Loan*, 79 F.R.D. 603 (D.N.J.1978); *DuPont Glore Forgan, Inc. v. A T & T*, 437 F.Supp. 1104, 1127–28 (S.D.N.Y.1977), *aff'd*, 578 F.2d 1367 (2d Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978).

area enlisted General Motors' help in eliminating a practice whereby other Chevrolet dealers worked with discounters to sell cars to the public at prices well below what dealers normally charged their customers.

The Court said there could be no doubt that the *effect* of the combination between General Motors and the dealer associations was to restrain trade. The Court continued:

> We note, moreover, that inherent in the success of the combination in this case was a substantial restraint upon price competition–a goal unlawful *per se* when sought to be effected by combination or conspiracy. *E. g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505; *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129. And the *per se* rule applies even when the effect upon prices is indirect. *Simpson v. Union Oil Co.*, 377 U.S. 13, 16–22, 84 S.Ct. 1051, 1054–1057, 12 L.Ed.2d 98; *Socony–Vacuum Oil Co., supra.*
>
> There is in the record ample evidence that one of the purposes behind the concerted effort to eliminate sales of new Chevrolet cars by discounters was to protect franchised dealers from real or apparent price competition. ...
>
> The protection of price competition from conspiratorial restraint is an object of special solicitude under the antitrust laws. We cannot respect that solicitude by closing our eyes to the effect upon price competition of the removal from the market, by combination or conspiracy, of a class of traders. Nor do we propose to construe the Sherman Act to prohibit conspiracies to fix prices at which competitors may sell, but to allow conspiracies or combinations to put competitors out of business entirely.

384 U.S. at 147–48, 86 S.Ct. at 1331–32.

Nowhere in its opinion did the Court even imply that price competition deserved "special solicitude" only when the alleged restraint was clearly horizontal or vertical. Nor did the Court consider it important to characterize the particular combination at issue, which had some horizontal elements (dealers combining with other dealers), some possibly vertical elements (franchisees combining with franchisor), and some highly unusual elements. As long as the price restraint was clear, the particular method of implementing it was not important. *See United States v. Socony, supra*, 310 U.S. at 222, 60 S.Ct. at 844 (agreements to raise or lower prices would be illegal "whatever machinery for price–fixing was used"); *United States v. Container Corporation of America, supra*, 393 U.S. at 337, 89 S.Ct. at 512.

Like the Supreme Court in *General Motors*, this court does not believe it can close its eyes on the defendants' clear purpose to restrain price competition. It is true that the National Agreement may not fall neatly into the most familiar molds of price–fixing agreements. In that vein, the defendants cite *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), in support of their argument that a business arrangement should not be placed in a *per se* category before the courts have gained considerable familiarity with the arrangement's effects and possible advantages. However, in *Broadcast Music*, the Court was dealing with blanket licensing for musical compositions protected by the copyright laws. The activities alleged to be illegal involved practical problems peculiar to the market for musical compositions. 441 U.S. at 10–16, 99 S.Ct. at 1557–1560. Because the Court had some doubt that blanket licensing *facially* appeared to restrict competition or competitive pricing, the Court declined to apply the *per se* rule. In contrast, this court has little difficulty concluding that the collaborative effort by members of NECA, through their association, to enlist the aid of the IBEW in implementing a designedly anticompetitive scheme is the kind of horizontal concerted activity recognized under § 1 of the Sherman Act as particularly dangerous to price competition. The Court therefore remains persuaded that Article Six of the National Agreement is *per se* illegal.

## 2. *Coercion or Imposition*

The *Broadcast Music* case gives rise to another argument the defendants have

made repeatedly in response to the allegations that Article Six amounts to *per se* illegal price–fixing. The theory is that the plaintiffs can prove no violation unless they establish that the defendants coerced the plaintiffs into accepting the NEIF provisions, or imposed upon the plaintiffs a contract containing the industry fund. The defendants rely principally on the Supreme Court's finding in *Broadcast Music* that the plaintiff had a "real choice" between obtaining a blanket license from the defendants at a standard price, and obtaining individual licenses from the composers themselves. Partly because those alternatives were available, the Court declined to categorize the blanket licenses as *per se* illegal.

That rationale in *Broadcast Music*, as well as the reasoning in the other cases cited by the defendants, is not applicable to the present case. The Supreme Court in *Broadcast Music* did not elaborate on the implications of "choice" other than to say its presence was one of several reasons not to find a *per se* violation under the circumstances. As this court has already pointed out, *Broadcast Music* involved a highly unusual fact situation. The most clearly distinguishing fact in the present case is the existence of a clear, written agreement to manipulate prices, with the equally clear intent of eliminating competition from non–NECA contractors. It is the agreement itself, entered into with an anticompetitive purpose, which is illegal under the Sherman Act. The possibility that the IBEW would, if pressed, negotiate separate collective bargaining agreements without the NEIF provision cannot change the illegal character of the undisputed conspiracy between the IBEW and NECA.

The existence of the conspiracy also distinguishes the present case from *Iodice v. Calabrese*, 345 F.Supp. 248, 268 (S.D.N.Y. 1972), *modified*, 512 F.2d 383 (2d Cir. 1975), in which the district court found that there was no agreement between the union and the contractors' association requiring the union to secure certain terms in all its collective bargaining agreements. Here the IBEW *did* agree to insert the NEIF provision in *all* construction agreements in the industry. In short, the court rejects the theory that a showing of coercion or imposition is a prerequisite to proving a *per se* illegal price–fixing arrangement.[13]

3. *Anticompetitive Effect*

Another argument the defendants raise in order to rebut the plaintiffs' contentions is that there can be no finding of a violation absent a showing of the anticompetitive *effect* of the NEIF provisions. It is clear that where price–fixing is concerned, the antitrust violation inheres in the agreement itself and in its illegal purpose; the very function of the *per se* rule is to obviate an exhaustive inquiry into the effects of price–fixing in each individual case. *United States v. Socony, supra,* 310 U.S. at 222, 60 S.Ct. at 843; *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 692, 98 S.Ct. at 1365; *Northern Pacific Railroad Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518;[14] Sullivan, Handbook of the Law of Antitrust § 71 at 194–95 (West 1977) (hereinafter "Sullivan"). As the Fourth Circuit recently stated in *United States v. Society of Independent Gasoline Marketers of America,* 1977–2 Trade Cases ¶ 61,753 (4th Cir. 1979):

> . . . This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable–an inquiry so often wholly fruitless when undertaken.

---

**13.** The majority of the cases the defendants cite in support of their "coercion" theory involve illegal boycotts or refusals to deal. The element of coercion inherent in those cases is simply not an issue in a price–fixing case. *See In Re Yarn Processing Patent Validity Litigation,* 541 F.2d 1127 (5th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).

**14.** In 356 U.S. at 5, 78 S.Ct. at 518, the Court said:

Since in a price–fixing conspiracy the conduct is illegal *per se*, further inquiry on the issues of intent or the anticompetitive effect is not required. The mere existence of a price–fixing agreement establishes the defendants' illegal purpose since "[t]he aim and result of every price–fixing agreement, if effective, is the elimination of one form of competition." *United States v. Trenton Potteries*, 273 U.S. 392, 397 [47 S.Ct. 377, 379, 71 L.Ed. 700] (1926).

The defendants correctly point out that the cases deeming inquiry into anticompetitive effect unnecessary are criminal cases brought by the government, and that the prerequisites for a plaintiff's recovery in a civil case are somewhat different. Part II of this opinion recognizes that a civil plaintiff has no standing to sue unless it can show direct injury to its business or property, 15 U.S.C. § 15, or threatened loss or damage, 15 U.S.C. § 26, proximately caused by a violation of the antitrust laws. The defendants argue that the plaintiffs cannot show the requisite harm or threat unless they prove the anticompetitive effect of the National Agreement on the electrical construction industry.

In the court's view, the defendants misconstrue the burden of proof on a civil plaintiff in an antitrust case. Although the crux of a private action is individual injury, *Windham v. American Brands*, 565 F.2d 59, 66 (4th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978), there is no requisite that the injury be shown by proving the anticompetitive effect of the defendants' agreement. The proof required will depend on the injury alleged. *See* P. Areeda, *Antitrust Analysis, Problems, Text, Cases* ¶ 159 (2d ed. 1974 and Supp. 1978) (hereinafter "Areeda"). The essential prerequisites to recovery are that the plaintiff's injury be causally related to the activity which violates the antitrust laws, and that the injury

be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[15] In a price–fixing case, the measure of the plaintiff's injury may be the full amount of the "overcharge;" that is, the difference between the fixed price and the price that would otherwise have prevailed. *Phillips v. Crown Central Petroleum Corp.*, 395 F.Supp. 735, 768 (D.Md.1975); *Wall Products Co. v. National Gypsum Co.*, 357 F.Supp. 832, 844 (N.D.Cal.1973); *Ohio Valley Electric Corp. v. General Electric*, 244 F.Supp. 914, 933 (S.D.N.Y.1965); Sullivan, § 251 at 785–86; Areeda, ¶ 159 at 70–71. *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Although determining what the price would have been absent a conspiracy may require some speculation, a wrongdoer should not be permitted to invoke the uncertainty created by his own wrong and use it to preclude a plaintiff's recovery. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946); *Ohio Valley Electric v. General Electric, supra*, 244 F.Supp. at 933–34.

In the present case, the plaintiffs claim that their injury is the amount of the contributions they have paid into the NEIF; and that their threatened loss or injury is their as yet unfulfilled obligation to pay into the fund. That injury is causally related to the defendants' illegal agreement, and flows from that which makes the defendants' conduct unlawful, namely the addition of a 1% "adder" on the cost of procuring IBEW contracts. The amount of the overcharge is ascertainable without unreasonable speculation, because it is expressed in terms of a percentage of employer payroll. The defendants claim it is practically impossible to estimate what the terms of collec-

15. In *Brunswick*, the court went on to say, "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." 429 U.S. at 489, 97 S.Ct. at 697. That language, however, was particularly applicable to the facts of the *Brunswick* case, which involved alleged violations of the anti–merger provisions of the Clayton Act, and not alleged price–fixing violations.

tive bargaining agreements would have been absent the NEIF, and that it is therefore equally difficult to calculate any overcharge. But to allow that argument to prevail would be to ignore the principle of *Bigelow* stated above. In short, the plaintiffs have made an adequate showing of the *fact* of their injury stemming from the defendants' conduct. There is therefore no need for proof of the anticompetitive effects of Article Six of the National Agreement.[16]

### 4. *The Labor Exemption*

A fourth argument which the defendants raise in order to show there has been no *per se* violation is that the agreement between NECA and the IBEW falls within the "labor exemption" from the antitrust laws. Although rooted in the Norris–LaGuardia Act,[17] and §§ 6 and 20 of the Clayton Act,[18] the exemption is non–statutory, developed by the courts in an effort to balance the national labor policy against the apparently conflicting antitrust policy. The central question is when the activities of a labor union are to be construed as a violation of the antitrust laws.

The exemption first began to take shape in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), in which the Supreme Court said:

> [A]n elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.

310 U.S. at 503–04, 60 S.Ct. at 997–98. In *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the Court considered "[W]hether the use of conventional, peaceful activities by a union in controversy with a rival union over certain jobs" was within the *statutory* exemption of § 20 of the Clayton Act. *Id.* at 227, 61 S.Ct. at 464. Justice Frankfurter wrote:

> So long as a union *acts in its self–interest and does not combine with non–labor groups*, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466 (footnote omitted; emphasis added).

The problem of a union combining with non–labor groups arose directly in *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Electrical contractors, electrical equipment manufacturers and the union had engaged in concerted activity to assure that the contractors would purchase only equipment manufactured in the New York City area, and that the manufacturers would sell their equipment in New York City only to contractors employing IBEW labor. There was no question that the union's aim in participating in the combination was to pursue its own interests and those of its members. *Id.* at 799–800, 65 S.Ct. at 1535. After reviewing the history of the tension between antitrust laws and Congress' labor legislation, the Court framed its analysis in these terms:

> The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.

*Id.* at 806, 65 S.Ct. at 1538.

Having decided that the union's activities, if taken alone, would *not* violate the Sherman Act, and that the contractors' and manufacturers' activities, absent union participation, *would* violate the Act, the Court

---

16. The actual amount of each plaintiff's damages must be determined at future proceedings.

17. 29 U.S.C. §§ 104, 105 and 113.

18. 15 U.S.C. § 17 and 29 U.S.C. § 52.

concluded that a union could not legally aid and abet businessmen who were committing antitrust violations. "Congress never intended that unions could, consistently with the Sherman Act, aid non–labor groups to create business monopolies and to control the marketing of goods and services." *Id.* at 808, 65 S.Ct. at 1534. "A business monopoly is no less such because a union participates, and such participation is a violation of the Act." *Id.* at 811, 65 S.Ct. at 1541.

The next cases to develop the labor exemption were *Pennington v. UMW*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and its companion case, *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). In *Pennington*, the Court considered the question whether a union could agree upon certain wage terms with a multi–employer bargaining unit and then agree with the employer group to seek the same wage terms from employers outside the unit. The complaint alleged that the union had entered into a conspiracy with large mine operators to impose agreed–upon wage scales on smaller, nonunion operators regardless of their ability to pay, with the purpose of driving the smaller companies out of business.

The Court found that the union's activity was not exempt from the antitrust laws.[19] Justice White wrote:

> We have said that a union may make wage agreements with a multi–employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has

agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry.

381 U.S. at 665–66, 85 S.Ct. at 1591 (footnote omitted). After weighing the concerns of the antitrust laws with the relevant labor policies, Justice White's group concluded that the agreement to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws. *Id.* at 669,[20] 85 S.Ct. at 1592.

In *Jewel Tea*, however, *Pennington's* companion case, the Court found that the agreement at issue *was* exempt from the antitrust laws.[21] The unions had obtained an agreement from a multi–employer bargaining group concerning marketing hours for food store meat departments. The unions then sought and obtained the same terms from an employer outside the bargaining group, but did so because the unions believed the terms would serve the unions' own best labor interests. They had not agreed with the employers in the bargaining group to seek the same terms from any other employer. 381 U.S. at 688, 85 S.Ct. at 1601. The Court defined the issue in the case to be

> whether the marketing–hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through

---

**19.** Justice White wrote the "opinion of the Court," joined by two other Justices. Justice Douglas wrote a concurrence joined by Justices Black and Clark; Justice Goldberg and two other Justices concurred in the result but dissented from the Court's opinion.

**20.** Justice Douglas' opinion differed from Justice White's primarily in that it said a union would be liable for an antitrust violation if the

union's agreement with the employers "was made for the purpose of forcing some employers out of business." 381 U.S. at 673, 85 S.Ct. at 1595. The issue of predatory intent is discussed in more detail, *infra.*

**21.** The Court split into the same three groups of three as in *Pennington*, with White writing the Court's opinion, Goldberg concurring only in the judgment, and Douglas dissenting.

bona fide, arm's–length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act. We think that it is.

*Id.* at 689–90, 85 S.Ct. at 1602. (footnote omitted).

The Court's most recent treatment of the labor exemption was in *Connell Construction Co. v. Plumbers & Steamfitters Local # 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The respondent union was party to a collective bargaining agreement with a group of mechanical contractors in Dallas. With the goal of organizing as many plumbing and mechanical subcontractors as possible, the union sought to have general contractors working in Dallas sign an agreement under which they would award subcontracts only to companies whose employees the union represented. If a general contractor refused to sign, the union picketed the company. At no time did the union represent or seek to represent the employees of the companies it picketed.

The Court concluded that the agreements between the union and the general contractors were not exempt from the antitrust laws.

This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

421 U.S. at 625, 95 S.Ct. at 1836.

Any application of the leading Supreme Court labor exemption cases to the facts of the present case must be done in light of the recent Fourth Circuit decision in *Smitty Baker Coal Co., Inc. v. UMW,* 620 F.2d 416 (4th Cir. 1980). In *Smitty Baker,* the Fourth Circuit set out the requirements for proving an antitrust violation in what the court called a *"Pennington*–type case."

Emphasizing the distinction between the applicability of the labor exemption and the actual existence of an antitrust violation, the court said:

To repeat: it is not enough that the Union may have entered into a contract with a multi–employer unit in a national industry to establish an antitrust violation by the Union or, for that matter, the employer–group. That may in some cases take the action out of the exemption enjoyed by labor, but it will not *per se* amount to an antitrust violation. To amount to an antitrust violation the agreement must be rooted in an anti–competitive purpose, and must effect an anti–competitive result, as evidenced by action "ruining" a competitor's business or driving him "out of business." Unless there is such an agreement between the labor organization and the non–labor group and such an anti–competitive result, there is no conspiracy actionable under the antitrust laws.

620 F.2d at 431–32.

The defendants argue that the language quoted above precludes any finding that the National Agreement violated the antitrust laws. However, the Fourth Circuit's opinion must be analyzed in two parts: first, for what it says about the labor exemption, and second, for what it says about actual proof of a violation. That two–part analysis will show that the defendants do *not* fall within the exemption, and that the National Agreement amounts to a *per se* violation of § 1 of the Sherman Act as a matter of law.

The court in *Smitty Baker* did not focus its attention on interpreting the labor exemption. Because the court concluded that there had been no conspiracy which would amount to a violation, the applicability of the exemption was not brought directly into issue. Accordingly, the case does not shed any new light on the question at the heart of the labor exemption: under what circumstances does the national labor policy outweigh the national antitrust policy, and dictate that an agreement which would otherwise run afoul of the Sherman Act be held immune from the provisions of that Act?

*Smitty Baker* instead concentrates on what a plaintiff must prove in order to make out an antitrust violation in a "*Pennington*—type case," focusing on the requirement of predatory intent. This court is satisfied that as the Fourth Circuit defined the *Pennington* model in *Smitty Baker*, the present case does not fit the mold, and is therefore not subject to the same requirements of proof. The model is described as follows:

> [The *Pennington*] doctrine requires (a) an agreement between the Union and an employer–group consisting of a substantial number of the larger employers in an industry to establish a wage scale for the employees–of–the–group–members–of– the Union, (b) which wage scale the Union and the employer group knew that the marginal employers in the industry could not afford, and (c) which wage scale the Union undertook to impose on the marginal nonmember operators, (d) with the intent to drive these marginal operators out of business and to remove them as competitors of the employer–group. And this is the view of the *Pennington* model as taken in other decisions and as expressed by commentators.

620 F.2d at 432–33. The court then noted that the model *had* to be so defined in order to avoid making a mockery of the statutory labor exemptions.

The facts of the case at bar do not require application of the "*Pennington* doctrine" as the Fourth Circuit has defined it. The agreement between the IBEW and NECA has nothing to do with a wage scale, but instead concerns an industry fund whose proceeds were to benefit only NECA and the willing and unwilling recipients of NECA services. While the determination of a wage scale is a central and intimate concern of organized labor, promotion of an employer–oriented industry fund is not. As *Smitty Baker* teaches, a union's activities concerning wages deserve special solicita-

tion under the national labor policy, and special safeguards against unwarranted application of the national antitrust policy. The same is not necessarily true of a union's agreement to assist an employer in implementing an intentionally anticompetitive scheme.

Unlike the plaintiff in *Smitty Baker*, the plaintiffs here have shown a clear, unequivocal agreement between the union and the employer group, and have demonstrated that the purpose of the agreement was to eliminate competition between NECA and non–NECA contractors in the electrical construction industry. This court cannot read *Smitty Baker* to hold that a union can *never* be liable under the antitrust laws unless the requirements of the *Pennington* doctrine are met. Where, as here, the plaintiff has made out a *per se* § 1 violation under the *Socony* doctrine and has demonstrated the defendant's anticompetitive purpose; and where, as here, the union activities in question do not directly involve wages or other terms and conditions of employment;[22] the union's liability must depend on the application of the non–statutory labor exemption to the particular facts involved.

Taking the Supreme Court's definitions of the nonstatutory exemption as a whole, as they are expressed in the cases discussed at pp. 539–541, *supra,* it appears to this court on balance that the policies behind the antitrust laws must take precedence over whatever labor considerations are involved in the present case. In *Hutcheson, supra,* 312 U.S. at 232, 61 S.Ct. at 466, the Court noted that the exemption applied so long as the union acted in its self–interest and did not combine with non–labor groups; here the IBEW has combined with an employer group to promote an industry fund which was not designed to serve union interests. In *Allen Bradley, supra*, 325 U.S. at 808 and 811, 65 S.Ct. at 1539 and 1540, the Court

---

**22.** The defendants argue that Article Six of the National Agreement *is* related to employment conditions because it represents a union concession to management in return for increased pension benefits, a shift clause and an appren-

tice ratio. If the court accepted that argument, any union undertaking would enjoy antitrust immunity as long as it was contained in a collective bargaining agreement. The court knows of no basis for so broad a holding.

condemned union participation in the creation of business monopolies and in the control of marketing goods and services; here the IBEW threw its weight behind what was in essence a business group's scheme to control the marketing of electrical construction services. In *Pennington, supra,* 381 U.S. at 665–66, 85 S.Ct. at 1590–1591, Justice White found that a union forfeited its exemption when it agreed with one employer to seek the same wages, hours or other employment conditions from other employers; here the IBEW agreed to require the NEIF language in *all* contracts in the electrical construction industry. As this court has already noted, the National Agreement is even more susceptible to the antitrust laws than the agreement in *Pennington,* because Article Six does not concern wages or other terms and conditions of employment. It instead concerns the price of contracts with the IBEW, and bidding competition in the industry. In *Jewel Tea, supra,* 381 U.S. at 689–90, 85 S.Ct. at 1601–1602, the Court made it clear that prices were *not* intimately related to wages and working conditions.[23] It is a fair inference from *Jewel Tea, supra,* 381 U.S. at 690, 85 S.Ct. at 1602, that the IBEW's agreement to obtain the NEIF provision from non-members of NECA, at the behest of and in combination with NECA, does not fall within the protection of the national labor policy, and is therefore not exempt from the Sherman Act. The Court's language in *Connell, supra,* 421 U.S. at 625, 95 S.Ct. at 1836, is applicable here: the NECA–IBEW agreement is the kind of direct restraint on the business market, whose potential anti-competitive effects "would not follow naturally from the elimination of competition over wages and working conditions."

 In short, the IBEW's role in agreeing to implement Article Six of the National Agreement raises no labor policy issues important enough to outweigh the strong, unequivocal policy embodied in the Sher-man Act and in the line of cases beginning with *United States v. Socony–Vacuum Oil,* condemning price–fixing agreements as *per se* illegal.

## D. Conclusion

For all the foregoing reasons, the court has concluded that it must grant the plaintiffs' motion for summary judgment, and declare Article Six of the National Agreement illegal *per se*. For the same reasons, the defendants' motions for summary judgment on the plaintiffs' primary claims must be denied. In granting the plaintiffs' motion, the court is mindful of the cases from both the Supreme Court and the Fourth Circuit holding that summary judgment is often inappropriate in antitrust cases, where "motive and intent play leading roles," or where "the issue of intent relates to an ambiguous contract or document." *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Morrison v. Nissan Motor Co.,* 601 F.2d 139 (4th Cir. 1979); *Cram v. Sun Insurance Office,* 375 F.2d 670 (4th Cir. 1967). However, it is clear that the summary judgment motion has a place in antitrust cases. *First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968); *White Motor Co. v. United States,* 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963). In the present case, the court has considered voluminous briefs and documents, and has heard several days of oral argument on the summary judgment motions. The written and oral presentations have raised no issue which the court considers a genuine dispute as to a material fact: the existence of the National Agreement is undeniable, and its purpose is clear from the language of the agreement itself as well as from the contemporaneous documents. In the court's view, it is therefore appropriate to declare Article Six of the agreement illegal as a matter of law.

---

**23.** As the Court explained more fully in *American Federation of Musicians v. Carroll,* 391 U.S. 99, 113, 88 S.Ct. 1562, 1571, 20 L.Ed.2d 460 (1968), the question is whether an agreement is "intimately bound up with the subject of wages," even if in *form* the agreement concerns prices. This court remains persuaded that the NEIF provision had nothing to do with wages.

## VI. *Plaintiffs' Motion for Class Certification*

Plaintiffs Commonwealth Electric Company (Commonwealth) and the Howard P. Foley Company (Foley) seek to have the present case certified as a class action on behalf of a class of plaintiffs defined as follows:

> All electrical contractors which, since July 1, 1977, (a) are not members of the National Electrical Contractors Association or its chapters and (b) have performed electrical construction work using electrical workers obtained and employed under the terms of "Inside" or "Outside" collective bargaining agreements with local unions affiliated with the International Brotherhood of Electrical Workers, AFL–CIO, which agreements contain or incorporate by reference the provisions of Article Six of the NECA–IBEW National Agreement.

Commonwealth and Foley are the purported representatives of the class.

A motion for class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. In order to prevail, the movant must show that all the requirements of Rule 23(a) are met, and that the requirements of part 23(b)(1), (b)(2) *or* (b)(3) are met as well. Commonwealth and Foley maintain that class certification is appropriate in this case under either 23(b)(2) or 23(b)(3). Accordingly, the pertinent provisions of Rule 23 are these:

> (a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

> (b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> . . . . .

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Having tested the requirements of Rule 23 against the arguments of all the parties, the court has concluded that certification of the class as the plaintiffs have defined it would be appropriate under Rule 23(b)(3). The court will address each requirement in turn, and explain how the plaintiffs have demonstrated their compliance with each one.

### A. *Numerosity*

By the plaintiffs' estimation there are approximately 7,800 electrical contractors which fall within the defined class. That number results from a comparison between the "IBEW Agreement Files," which identify all electrical contractors bound by collective bargaining agreements containing the NEIF provision, and the NECA membership list. Exhibit X to the plaintiffs' motion for class certification. The plaintiffs have therefore shown with adequate specificity that the class members are too numerous to make joinder practicable. *Cf. In*

*re Independent Gasoline Antitrust Litigation*, 79 F.R.D. 552 (D.Md.1978); *Predmore v. Allen*, 407 F.Supp. 1053, 1064 (D.Md. 1975); *In re Plywood Anti–Trust Litigation*, 76 F.R.D. 570, 578 (E.D.La.1976).

The defendants' argument that numerosity has not been established rests on their assumption that the class is too broadly defined. That assumption in turn rests on the theory that an electrical contractor is not properly a member of the class unless the NEIF provision was "imposed" on the company against its will. Because the court has rejected the "imposition" or "coercion" theory in deciding the motions for summary judgment, the defendants' numerosity arguments must be rejected as well.

### B. *Commonality*

■ The defendants do not seriously contest the plaintiffs' claim that there exists at least one question of law or fact common to all members of the class. The court finds that at a minimum, all those members would have to prove whether the defendants conspired and agreed to fix, maintain and stabilize the price of contracts with the IBEW. That finding is sufficient to satisfy the commonality requirement of Rule 23(a)(2). *In re Independent Gasoline Antitrust Litigation, supra*, 79 F.R.D. at 557; *In re Toilet Seat Antitrust Litigation*, 1976–1 Trade Cases ¶ 60,915 at 69,002–03 (E.D.Mich.1976).

### C. *Typicality*

The substance of this requirement, and the extent to which it is distinguishable from the provision of Rule 23(a)(4) regarding adequacy of representation, are both somewhat ill–defined. Although the two requirements certainly overlap, the typicality inquiry is broader and less exacting. Judge Thomsen of this court, sitting by designation in the Western District of Oklahoma, described the typicality requirement as follows:

> The requirement of Rule 23(a)(3) is that the claim of the representative parties be "typical" of the claims of the class, and

that Rule 23(a)(3) does not require that the claims of the class representatives be "co–extensive with" or "identical to" those of other class members. The requirement of typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class.

*In re Four Seasons Securities Laws Litigation*, 59 F.R.D. 667, 681 (W.D.Okl.1973), *rev'd on other grounds*, 502 F.2d 834 (10th Cir.), *cert. denied*, 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974); *American Finance Systems, Inc. v. Harlow*, 65 F.R.D. 94 (D.Md.1974). *See also Smith v. B & O Railroad Co.*, 473 F.Supp. 572, 581 (D.Md. 1979). The requirement has also been defined as the third in a series of questions posed by Rule 23(a): (1) Who are the proposed class? (2) What are the claims of the class? (3) *What is the individual claim of the class representative?* (4) Who is the representative? 3B *Moore's Federal Practice* ¶ 23.06–2 at 23–191 to 92. Under that approach, "[a]ny inquiry into the typicality under Rule 23(a) requires a comparison of the claims or defenses of the representative with the claims or defenses of the class." *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 270 (10th Cir. 1975).

■ The claims of the class members are that the defendants conspired to fix, maintain and stabilize the price of contracts with the IBEW, and consequently raised the cost of doing business in the electrical contracting industry, all in violation of § 1 of the Sherman Act. The class members all allege that the conspiracy arose out of the same set of circumstances. The class representatives, Foley and Commonwealth, have set forth claims identical to those of the class members. The requirement of typicality is therefore met.

### D. *Adequacy of Representation*

The inquiry under subpart (a)(4) of Rule 23 is usually divided into two prongs: (1) whether there are conflicts of interest be-

tween the class representatives and the class members in connection with the subject matter of the litigation; and (2) whether the class representatives' counsel are competent to conduct the litigation on behalf of all class members. 3B *Moore's Federal Practice* ¶ 23.07[1] at 23–202 to 03; *Lewis v. Capital Mortgage Investments,* 78 F.R.D. 295, 302 (D.Md.1977); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1101, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

The second of those two prongs is the more easily satisfied here. All counsel have expressed the highest confidence in and respect for the inherent competence and ability of the attorneys for Foley and Commonwealth. However, the defendants have expressed some concern that the record in this case shows plaintiffs' counsel to have been dilatory and less than vigorous in their prosecution. The court agrees that in the earlier stages of the case, the plaintiffs appeared to have great difficulty in defining their claims and carrying them forward. Nevertheless, the record as a whole, especially in light of the oral arguments on the motions decided today, demonstrates that the plaintiffs' attorneys are vitally interested in pursuing the litigation to its conclusion, for the benefit of all the class members. The work of all counsel in briefing and arguing the motions being decided today has been exemplary in that respect.

█ The only real question on the issue of adequate representation is therefore whether Commonwealth and Foley are appropriate class representatives. The courts have identified two principal criteria to be considered in connection with that part of the Rule 23(a)(4) analysis. First, the proposed class representatives must show that their interests are coextensive with those of the class members to such a degree that the representatives will vigorously prosecute or defend the class's interests. Second, the proposed class representatives must show

that they have no interests which are antagonistic to those of the class members. 3B *Moore's Federal Practice* ¶ 23.07[2] at 23–219; *Smith v. B & O Railroad Co., supra,* 473 F.Supp. at 580; *Lewis v. Capital Mortgage Investments, supra,* 78 F.R.D. 295. In the court's view, Foley and Commonwealth have satisfied both those criteria.

In challenging the adequacy of Foley and Commonwealth as class representatives, the defendants cite six principal conflicts of interest between one or both of the two corporations and the rest of the class members. The first alleged conflict arises from the fact that since this suit began, both Foley and Commonwealth have signed a total of at least three Letters of Assent "A" authorizing certain local NECA chapters to act as the corporations' collective bargaining agents with the corresponding IBEW locals. According to the defendants, Foley and Commonwealth have bound up their business interests with the success of their agency relationship with NECA. The court is not persuaded that that is true. In the first place, the plaintiffs assert that the creation of the agency relationship through the signing of Letters of Assent "A" rather than "B" was an inadvertent aberration from Foley's and Commonwealth's usual policies. Even if the class representatives intentionally authorized NECA chapters as their collective bargaining agents, the two corporations' interest in signing Letters of Assent would not dilute or conflict with Foley's and Commonwealth's interest in procuring the benefits that would accrue to them if the defendants were found guilty of an antitrust violation and the NEIF were invalidated. The record simply does not support the idea that either corporation would diminish its opposition to the NEIF in order to preserve its limited agency relationships with a very few NECA chapters.[24]

---

**24.** It is interesting to note that some of the defendants contend Foley's and Commonwealth's interests are not representative of those of the class because the corporations have *no* stake in successful agency relation-

ships with local NECA chapters. Defendants' (except IBEW and Pillard) Memorandum in Opposition to Motion for Determination of this Suit as a Class Action, at 53–54.

The second alleged conflict of interest stems from the fact that the defendants have lodged counterclaims against Foley and Commonwealth. The defendants argue that the posture of the case makes the class representatives more likely to settle, at the expense of the class members' interests. Although the court has been watching closely, there has not been even a glimmer of an indication that Foley or Commonwealth seeks settlement. Absent a more specific showing than the defendants have made, the court is unwilling to adopt the idea that the mere filing of a counterclaim renders the counterclaim–defendant an inadequate representative of the plaintiff class.

The third alleged conflict applies only to Commonwealth, and is supposedly inherent in the company's corporate structure. Two wholly–owned Commonwealth subsidiaries are members of NECA. The defendants argue that the subsidiary companies' business interests are therefore "bound up with the activities and fortunes of [NECA]," Opposition of IBEW Defendants to Plaintiffs' Motion for Determination of This Suit as a Class Action at 32, and that the parent company's interests are in turn tied to those of NECA. The court cannot see how such an interrelationship creates a factual conflict of interest for purposes of Rule 23. As the defendants acknowledge, Commonwealth as a whole is and was sufficiently independent of NECA to be able to terminate its membership in the association when the NEIF took effect. In the court's view, that action is far more revealing of the alignment of Commonwealth's interests than is the continuing NECA membership of two of the corporation's subsidiaries.

The fourth alleged conflict is closely related to the third in that it arises out of Commonwealth's corporate structure. Commonwealth's parent corporation, C/E Construction Company, is what is known as a "double–breasted" organization: within its corporate family are both union and non–union electrical construction companies. Because the complaint alleges that the defendants' illegal practices placed class–member (union) contractors at a competitive disadvantage with respect to non–union contractors, the defendants argue that the non–union companies within C/E Construction Company stand to gain from the effects of the NEIF, and that Commonwealth's membership within the same corporate family disqualifies it as an advocate of a class of union contractors. The court does not find that logic convincing. Commonwealth's union status and its interest in invalidating the NEIF are closely aligned with those of the class members. There is no evidence that the parent corporation, C/E, would rather perpetuate the NEIF–generated advantage of its non–union subsidiaries than eliminate the NEIF–generated disadvantages of its union subsidiaries. Similarly, there is no indication Commonwealth would sacrifice its own interests in order to further those of a non–union sister corporation. The alleged conflict of interest is therefore purely speculative.

The fifth alleged conflict stems from the difference in size between Foley and Commonwealth on the one hand, and the majority of the class members on the other. The defendants argue that "large travelling contractors who enter an area for a single project, hire electricians, complete the job, and leave, perhaps forever," NECA Defendants' Opposition Memorandum at 54, do not share and cannot represent the interest of smaller, less transient contractors who have a greater stake in preserving good will with the local unions. The defendants cite the lack of antitrust actions brought by smaller companies as evidence that those companies do not share Foley's and Commonwealth's interest in challenging the NEIF. As the plaintiffs point out, however, the lack of parallel lawsuits could just as easily be attributed to the smaller companies' inability to afford lengthy litigation, or their reluctance to antagonize the IBEW directly, in their own names. Whatever the size of the company, each has an interest in avoiding being victimized by an illegal price–fixing scheme, and Foley's and Commonwealth's size and resources make the two corporations more rather than less appropriate as class representatives.

The sixth and final alleged conflict of interest arises from the differences in the relief sought by Foley and by the class as a whole. From the memoranda and exhibits submitted, the court understands that Foley seeks both damages and injunctive relief, as do the class members. But more importantly, the court cannot see that any differences which *might* exist would create a fatal conflict of interest. The size of Foley's economic stake in the outcome, when viewed in terms of what the corporation would be obligated to pay if the NEIF were found to be legal, is great enough to ensure that the corporation will be a vigorous and diligent class representative as far as proving a violation is concerned. There is no reason to suspect that Foley's vigor would diminish when the time came to collect treble the amounts paid into the fund, whether Foley's own payments were relatively small or not. Nothing in *Air Line Stewards and Stewardesses Association v. American Airlines, Inc.*, 490 F.2d 636 (7th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 773 (1974), or *Maynard, Merel & Co. v. Carcioppolo*, 51 F.R.D. 273 (S.D.N.Y. 1970), indicates to the court that Foley's representation of the class would be inadequate.

■ Because none of the alleged conflicts of interest between the proposed class representatives and the rest of the class members is significant, the court is satisfied that Foley and Commonwealth "will fairly and adequately protect the interests of the class," and the requirements of Rule 23(a)(4) are therefore met. The next issue is whether the proposed class satisfies the requirements of either 23(b)(2) or 23(b)(3).

Although the plaintiffs argue that they have met the requirements of both those subparts, the court has serious doubts as to the class's qualifications under ¶(b)(2). However, because the court agrees that all the requirements of ¶(b)(3) have been met, it will not be necessary to decide the (b)(2) issues one way or the other. Accordingly,

the court will conduct only those inquiries necessary under 23(b)(3): (1) whether the issues of law and fact common to the class predominate over individual issues; and (2) whether a class action is superior to other available methods of adjudication, especially in terms of manageability. *Technical Learning Collective v. DBAG*, 1980–1 Trade Cases ¶63,006 (D.Md.1979); *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977).

### E. *Predominance of Common Issues*

The leading case governing the predominance question in the Fourth Circuit is *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977). Sitting *en banc*, the court rejected the idea that there was "almost a rebuttable presumption" in favor of class certification in antitrust suits,[25] and set out a three–step process for determining whether the requirements of 23(b)(3) had been met.

■ The court first noted that in any private antitrust action, there were three essential elements to be proved: a violation of the antitrust laws, direct injury to the plaintiff caused by the violation, and the damages the plaintiff sustained. *Id.* at 65. It was therefore not enough, the court reasoned, to determine only that issues of violation were common to the class, and to conclude that common issues therefore automatically predominated. Injury and damages might be common issues if their proof were "virtually a mechanical task," "capable of mathematical or formula calculation." But if questions of injury and damages required complex, individualized proof, then the common violation issues could not be said to predominate. *Id.* at 68; *Technical Learning Collective, supra*, 1980–1 Trade Cases at 77,026. "The law of this Circuit, then, demands a searching inquiry into all three elements of an antitrust suit before the district court can actually conclude that common questions predominate over individual issues." *Id.* at 77,026. The court is

---

**25.** The "rebuttable presumption" idea had been adopted in the majority opinion of the panel which originally heard the case on appeal, 539 F.2d 1016, 1021 (4th Cir. 1976).

satisfied that in the present case, common issues as to violation, injury *and* damages predominate over any issues requiring individualized proof.

### 1. *Violation*

The defendants argue that the conspiracy issues do not lend themselves to common proof because the plaintiffs will have to show that each local union and each local business agent with whom the plaintiffs dealt adhered to or otherwise participated in the alleged conspiracy. That argument is merely an extension of the theory that Article Six of the National Agreement is not illegal unless the individual local unions "imposed" it on unwilling electrical contractors. As the court has already stated, it rejects that theory. In order to establish the defendant's liability, the plaintiffs have to show:

 —that the defendants entered into an agreement to fix prices

 —that the purpose of the agreement was to eliminate competition

 —that the commodity or service whose price was fixed is within the ambit of the antitrust laws

 —that the agreement does not fall within the labor exemption to the antitrust laws

 —that the agreement was the proximate cause of the injuries the plaintiffs allege.

If the plaintiffs can prove those elements, they will have established the defendants' liability as to each and every plaintiff who made payments to the NEIF,[26] whether or not the payments were the result of "coercion" or "imposition" as the defendants define it.

In that respect, the present case is distinguishable from both *Kline v. Coldwell, Banker & Company*, 508 F.2d 226 (9th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), and *Trecker v. Manning Implement, Inc.*, 73 F.R.D. 554 (N.D.Iowa 1976). In each of those cases, the alleged conspiracy was among a relatively large number of independent real estate brokers or auto parts dealers. Proof of liability on the part of only some defendants could not be presumed to establish that every plaintiff had paid an illegally–fixed price. In the present case, on the other hand, the plaintiffs need prove a conspiracy between *only* NECA and the IBEW in order to support their damages claim. The issue of the other defendants' participation will not affect the plaintiffs' right to recover, as long as the plaintiffs prove the NECA–IBEW conspiracy. The elements of that proof, listed above, are common issues that predominate over any individual issues pertaining to the existence of a violation.

### 2. *Injury and Damages*

The second and third areas for searching inquiry under the *Windham* rule are the *fact* of injury (or the impact of the conspiracy on the plaintiffs), and the amount of damages suffered. Because they are so closely related in the present case, the court will treat them together. Once again, the defendants argue that individualized issues would predominate in the plaintiffs' showing of impact and damages, because each plaintiff would have to show how a particular union local or locals "imposed" the NEIF on the unwilling contractor. Proof of the necessary coercion would therefore require the "separate mini–trials" which *Windham* determined must preclude class certification. In support of their position, the defendants cite several cases, notably *Ungar v. Dunkin' Donuts*, 531 F.2d 1211 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), for the proposition that common issues do not predominate where individual coercion is at issue.

The court remains convinced that individual coercion is *not* at issue in this case. Defendants' authority consists primarily of cases dealing with illegal tie–ins; those cases do not provide much guidance in a

---

**26.** Liability would also be established as to those who are threatened with having to make such payments, or who were indirectly injured by having the cost of the payments passed on to them. *See* Part III, *supra*.

price–fixing context. While coercion is plainly an element of tying under § 1, it is not crucial to establishing that the conspiracy between NECA and the IBEW proximately caused injury to the plaintiffs, and injury in a readily–calculable amount. On the contrary, proof of impact and damages in this case "breaks down in what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculation.'" *Windham, supra,* 565 F.2d at 68. The plaintiffs claim that the impact of the defendants' scheme is the higher cost of obtaining contracts for IBEW labor, and consequently the higher cost of carrying on the electrical contracting business as a whole. They also claim that the measure of the cost increase is the amount of the plaintiffs' NEIF payments, and is therefore readily determinable from the NEIF's records.

The defendants rebut that analysis as "simplistic," arguing that the amount of any overcharge–which is the correct measure of damages in a price–fixing case, Sullivan § 251 at 785–86; *See also Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)–can be established only by proving what the plaintiffs would have paid for IBEW labor absent the industry fund provision. That hypothetical price, according to the defendants, is a function of so many variables in the labor–negotiation process that it cannot be the subject of common proof.

The court does not find the defendants' argument persuasive. The one per cent charge payable to the NEIF was added onto the provisions of labor contracts already in existence in July of 1977. The parties to the National Agreement intended that it would be inserted into "all construction agreements in the electrical industry" (Article Six of the National Agreement). The amount of a particular contractor's obligation depended on both the size of its gross labor payroll and the fixed percentage determined solely by the local NECA chapter. There is no indication that the percentage or the obligation itself was meant to be negotiable, depending on the strength or location of an individual contractor.

Under those circumstances, the amount of the NEIF surcharge is for all practical purposes equivalent to the overcharge proximately resulting from the NECA–IBEW agreement. Furthermore, if the court accepted the defendants' analysis, the plaintiffs would very likely be left with no means of establishing the specific amount of their damages. Although some of the defendants suggest that the plaintiffs make individual showings of "the bargaining and economic circumstances of each local area and union," Opposition of IBEW Defendants to Plaintiffs' Motion for Determination of this Suit as a Class Action at 48, speculation about what those circumstances *would* have been absent the NEIF could hardly provide a court with a reliable basis for computing damages. As a matter of policy, an antitrust defendant should not be able to thwart any recovery against it by alleging that its own conduct "muddied the waters" to a point where the amount of overcharge became incalculable. The court has already clarified its position on that issue in Part V, *supra,* citing *e. g. Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Where, as here, there is a written agreement containing a mathematical description of the charge to be uniformly exacted, and there are records of the amounts paid pursuant to the agreement, the measure of damages need not be established by individualized proof.

Because ascertaining injury and damages to the plaintiffs is "virtually a mechanical task," common issues predominate, and the first requirement of Rule 23(b)(3) is therefore met. The only remaining question is whether the second requirement of that subpart has also been met; that is, whether class action is superior to other available methods of adjudication.

## F. *Superiority of Class Action*

The court is persuaded that class action is superior to other methods of litigating this case for several reasons. First, the cost to each plaintiff of litigating its claim individually might preclude meritorious claims and

dilute the deterrent effect of the Sherman Act's treble–damage provision. *Technical Learning Collective, supra.* Certifying the class with Foley and Commonwealth as its representatives will ensure that the suit will not perish solely for lack of financial resources. Second, a class action will probably have the least burdensome impact on the judicial system, a consideration the Fourth Circuit in *Windham* found to be particularly important. 565 F.2d at 70, 72. Common proof of the liability issues, and mechanical determination of damages, will permit the most efficient resolution of the controversy. Third, the court cannot foresee any serious manageability problems if the suit goes forward as a class action: the class representatives have agreed to assume the cost of notifying class members, and the NEIF records are likely to make notification a relatively straightforward (although laborious) task. Fourth, the class members do not appear to have a strong interest in pursuing individual lawsuits. As the plaintiffs noted at oral argument, the defendants themselves have argued in another context that many class members may be hesitant to sue individually, for fear of jeopardizing their continuing relationships with the IBEW. In the court's view, that possibility implies that the controversy will be litigated most thoroughly and effectively if it proceeds as a class action. *See Technical Learning Collective, supra.*

In sum, class action is superior to other methods of litigation in the present case. The plaintiffs have met the criteria of Rule 23(b)(3) as well as those of Rule 23(a), and the motion for class certification must accordingly be granted. Pursuant to Rule 23(c)(2), the court will direct that the class representatives provide individual notice to all members who can be identified through reasonable effort, and that they provide the best notice practicable to all other members.

### VII. *Plaintiffs' and Defendants'*[27] *Cross–Motions for Summary Judgment on the Defendants' Counterclaims*

The essence of the NECA defendants' motion is the allegation that the plaintiffs, in refusing to pay the amounts they owed the NEIF, and in filing suit to invalidate the industry fund, engaged in an illegal boycott of the NEIF with the purpose of damaging NECA. The NECA defendants characterize the boycott, and the plaintiffs alleged conspiracy that resulted in the boycott, as a violation of § 1 of the Sherman Act. In their cross–motion, the plaintiffs seek summary judgment declaring that as a matter of law, the NECA defendants are not entitled to recover on any of their counterclaims.

In light of the court's conclusion that the plaintiffs are entitled to summary judgment on the issue of the National Agreement's illegality, it would be anomalous to conclude that the plaintiffs' refusal to pay into the NEIF was and is an illegal boycott. Even if the court were to address the merits of the counterclaims without regard to the NEIF's illegality, the court would have considerable difficulty characterizing the plaintiffs' alleged concerted action as the type of activity forbidden by the Sherman Act. But because the NEIF is illegal *per se,* the plaintiffs' refusal to contribute to it cannot subject them to antitrust liability. Their motion for summary judgment on the counterclaims must be granted, and the defendants' must be denied.

### VIII. *Summary*

The disposition of the pending motions can be summarized as follows:

(1) the defendants' motion to dismiss NCA as a plaintiff must be denied;

(2) the defendants' motion to dismiss the claims of the "indirect–hire" plaintiffs must be denied as to the § 16 claims, but granted as to the § 4 claims;

(3) the motion of defendants Colgan and Miller to dismiss the complaint as to them must be denied;

(4) the plaintiffs' motion for summary judgment on the primary claims must be

---

**27.** As the court explained in Part I., only NECA and the NEIF trustees have filed counterclaims. The motions discussed in Part VII apply only to those defendants.

granted, and the defendants' cross–motion for summary judgment on the same claims must be denied;

(5) the plaintiffs' motion for class certification must be granted; and

(6) the plaintiffs' motion for summary judgment on the defendants' counterclaims must be granted, and the defendants' cross–motion for summary judgment on the same claims must be denied.

The court will enter a separate order to that effect.